JOHN FOX v. THE PENINSULAR WHITE LEAD & COLOR
WORKS.

[See 84 Mich. 676.]

*Negligence—Injury to employé—Evidence.*

1. A ticket issued by a superintendent of the poor, upon which the
   plaintiff in a negligence case was admitted to the poor-house
   for treatment for the injuries complained of, and the indorse-
   ment thereon of the city physician showing plaintiff's discharge
   from a hospital, and stating the nature of his disabilities, and
   that, because of his inability to support himself, he is sent to
   the poor-house for treatment, are inadmissible as evidence in his
   favor on the trial of the case.

2. The testimony of a physician as to his diagnosis of a case, not
   based upon any history of the case, and whose opinion as to
   the cause of the paralysis, with which the patient is afflicted,
   is based upon the conclusions of another physician, is incom-
   petent testimony.

3. The testimony of co-employés of a plaintiff in a negligence
   case, that they were not informed of the dangerous nature of
   the common employment, is inadmissible to rebut the testi-
   mony of the defendant that the plaintiff was so informed.

4. It is improper to ask a witness, who has testified that the
   plaintiff in a negligence case had been discharged by another
   employer than the defendant for drunkenness, if he (the wit-
   ness) is a total abstainer.

5. Cutaneous diseases affecting the exposed parts of the body, and
   paralysis, are not latent, and it does not require either a des-
   cription of symptoms or the skill of a physician to discover
   their existence.

6. One who has had an actual experience for 15 years, with 100
   employés, engaged in the manufacture of Paris green, and who
   has made observations as to the effect of the ingredients used
   on such employés, is competent to testify whether cutaneous
   diseases and paralysis follow such employment.

Error to Wayne. (Hosmer, J.) Argued May 11, 1892.
Decided June 10, 1892.

Negligence case. Defendant brings error. Reversed.
The facts are stated in the opinion, and in 84 Mich. 676.

*Cutcheon, Stellwagen & Fleming,* for appellant.

*James H. Pound ( C. J. Lowrie,* of counsel), for plaintiff, contended:

1. The ticket of admission to the poor-house, and indorsement, were a part of a public record, and admissible; citing 1 Greenl. Ev. §§ 483, 484; *Sawyer v. Baldwin,* 11 Pick. 493; *Hunt v. Order of Chosen Friends,* 64 Mich. 671.

McGRATH, J. This case was before this Court in January, 1891, and is reported in 84 Mich. 676, to which reference is made for a statement of the facts. On the second trial plaintiff recovered a judgment, and defendant appeals.

It appears that for some time after the injury plaintiff was at the Wayne county poor-house. On the trial plaintiff offered in evidence the following poor-master's ticket:

"DETROIT, JULY 28, 1888.
" *To the keeper of the Wayne county-house:*
"Please admit John Fox to the Wayne county poor-house, and provide for his necessities as a city charge.
"JOHN F. MARTIN,
"Superintendent of the Poor."

Upon the back of this ticket is the following indorsement:

"This man was ill with arsenical poisoning at Harper Hospital, from which he was discharged on June 30. Shortly after he was affected with paralysis and *anæsthæsia* of the feet, due to the same cause, and, being unable to earn his living, is now sent to you for treatment.          "H. ERICKSON, City Physician."

Defendant's counsel objected to the admission of both ticket and indorsement, but both were admitted and read in evidence. Neither was admissible. The fact

that the poor-house ticket was necessary to plaintiff's admission did not make it admissible as evidence, nor did the fact that the State required a record to be made of his admission. The fact of his admission to the poor-house as a public charge was irrelevant, and could but prejudice the jury in his favor.

Plaintiff had, before his employment by defendant, been employed by the Acme White Lead & Color Works, in grinding dry color and vermilion, which contained a large percentage of lead, and it was insisted by defendant that plaintiff's troubles were attributable to lead, rather than arsenical, poisoning. Dr. Erickson was not called, and no reason was given why he was not, except that upon the previous trial he was called by defendant, and it is urged by plaintiff's counsel that he was presumably hostile. The indorsement purports to be simply information sought to be conveyed by Dr. Erickson to the officials at the poor-house. It is urged that this information was usually entered upon the records of the poor-house, and was admissible as a part of such records. There is no statute requiring the city physician to give such information or providing for its record. If entered at all, it was entered upon the official registry, undoubtedly kept of each patient on his admission. The rule is that such registrations are not, in general, evidence of any facts not required to be recorded in them, and which did not occur in the presence of the registering officer. Thus a registry of marriage or of baptism is evidence only of that fact. 1 Greenl. Ev. § 493. The mention of the child's age in the register of christenings is not proof of the day of its birth, to support a plea of infancy. *Burghart v. Angerstein,* 6 Car. & P. 690. Regarding certificates given by persons in official station, the rule is that, if the person was bound to record the fact, the proper evidence is a copy of the record; but as

to matters which he was not bound to record, his certificate, being extra-official, is merely the statement of a private person. 1 Greenl. Ev. § 498; *Oakes v. Hill*, 14 Pick. 442.

Plaintiff called as a witness one Dr. Zimmerman, who was the practicing physician in charge of the Wayne county poor-house, who stated that—

" He became acquainted with the plaintiff; that plaintiff's feet were partially paralyzed; that he did not seem to have any use of his feet to any extent; that he was in the hospital about eight months; that he had no other sickness that witness could remember; that he has paid no special attention to the subject of the effect or nature of arsenical or other poisons, but knew that arsenic and what was known as 'blue vitriol' were deadly poisons; that he thought there was an eruption from external arsenical poisoning, and that partial paralysis, to a greater or less degree, is one of the consequences of arsenical poisoning; that when Fox came he brought with him a statement of his history, and that the paper shown was brought by Fox, and that at the time H. Erickson was one of the city physicians of the city of Detroit.

" *Q.* What was your diagnosis ? Have you any recollection now of it at the time you received him?

" *A.* Partial paralysis.

" *Q.* Arising from what cause?

" *A.* I think the cause was based upon that paper.

" *Q.* What did you arrive at from your inspection of it, and the information that was communicated to you by that there as a part of the history of the case ? From the history of the case, what did you attribute that paralysis to in your diagnosis?

" *A.* From arsenical poisoning."

On cross-examination witness testified that "he never had a case of arsenical poisoning except this one; that he deduced his diagnosis of paralysis from plaintiff's appearance, and the cause was from the paper, and that he knew nothing about the case, except a paper that was before him, and is not in evidence."

Defendant's counsel moved that the testimony of the witness as to the diagnosis be stricken out, but the mo-

tion was overruled, and defendant excepted. It does not appear just what this paper contains, except that plaintiff's counsel in their brief claim it was Dr. Erickson's certificate. It is clear, then, from the testimony of the witness, that he did not base his diagnosis upon any history of the case, but based his opinion as to the cause of the paralysis upon Dr. Erickson's conclusions. The court erred in overruling the motion.

Several physicians were called as experts to give their opinions upon hypothetical questions asked as to the cause of plaintiff's paralysis, and, from an examination of the record, it is clear that the hypothetical questions involved facts and conditions which were not supported by the testimony. In the manufacture of Paris green a quantity of sal-soda is first put into a vat. This is dissolved by steam turned in from the side of the vat, 5 or 6 inches from the bottom. The vat is about 5 feet 6 inches in height, and when the sal-soda is dissolved the vat is about two-thirds full of sal-soda and water. The steam is then turned off, and the powdered arsenic is shoveled and poured from kegs into the liquid already in the vat. After this is done, the steam is again turned on from 25 to 40 minutes, during which time the stirring of the mass is kept up. The quantity of arsenic put into the vat would fill it up from one to two inches. The object of the injection of the steam is to boil the mass. It is clear that in this process the steam was forced, not into or upon a quantity of dry powdered arsenic, but was injected horizontally into a mass composed of sal-soda, water, and arsenic; but the hypothetical question put was:

"Suppose that the man was employed to mix powder, that is, was set to work mixing a powdered stuff with steam blowing on it, until it was reduced to a sort of jelly; that a portion of his duty while it was arriving at

this stage was to stand above the vat, and keep stirring it, * * * to what would you attribute the condition of that man, if you ascertained that the article that he was working in had been powdered arsenic?"

"Now, doctor, if you take a quantity of powdered arsenic, and place it in a vat, and reduce it to a solution by blowing steam on it, or allowing steam to blow into it, would the force that would be necessary to heat that matter hot enough so as to become fused into some different element be sufficient to raise any of the particles, in your opinion?"

Again: "If a man went to work at the mixing and handling of powdered arsenic, by putting it in a vat and turning steam thereon until the steam and the water did form, from their coming together with the arsenic, an entirely different substance, rendering solid arsenic soluble, and that during the time that this process was going on it was the duty of the man to keep the mass stirred, * * * and you ascertained that the contents of the vat was white powdered arsenic mixed with steam, what would you attribute the condition of this person to?"

After the usual answer, that they would attribute the condition of the man to arsenical poisoning, the witnesses replied as follows:

"The force of the steam would be strong enough to raise portions of it and circulate it in the air, and any person standing over it could not avoid inhaling it, if the particles came in contact with the spongy portions of his body."

"The fact of the process necessary to reduce powdered arsenic to a paste or gelatine, in an open vat by steam, would necessarily force particles off with the steam, which would be just as virulent as the other arsenic."

One of plaintiff's co-employés was called, and testified as follows:

"Q. What was said, if anything, by Mr. Abel [the superintendent] to Mr. Fox, telling him of the nature of the danger of the business?

"A. Nothing at all.

"*Q.* Was there anything said to you?    (Objected to, but answered.)"

In the former case it was held that evidence that defendant notified other employés of the dangerous character of the common employment was inadmissible to rebut the testimony of plaintiff that he was not so informed.   Equally inadmissible is the testimony of other co-employés that they were not informed, to rebut the testimony of defendant that plaintiff was so informed.

A witness connected with the Acme Works was called for defendant, who stated that the plaintiff had been discharged by that company three times for drunkenness.   On cross-examination, plaintiff's counsel asked the witness this question:

" You yourself are a total abstainer, are you not?"

Objection was interposed, but the court overruled the objection.   The question was an improper one, and the court erred in admitting the testimony.

Defendant called as a witness one who, although not a physician or graduate from any medical school, had given a good deal of attention to chemistry, who for 15 years had been engaged in the manufacture of Paris green, having about 100 men in his charge, and who had studied the effects upon the operation of steam arising from the compositions described.   This witness was asked the following questions, all of which were objected to, and the testimony excluded:

" Beyond that, what have any of the men under your employ, during this long term and large experience, suffered? "

" How many men, during all that period, employed by you, or under your supervision, in the manufacture of Paris green, have you known to be affected by the work on the Paris green, beyond an occasional breaking out on the face, as you have described? "

" State whether or not you have observed any other

injurious effect in any case, in all your experience, as to
pustulation of the face arising from working over this
striking tub."

We think the testimony was competent. Cutaneous
diseases affecting the exposed parts of the body, and
paralysis, are not latent, and it does not require either
a description of symptoms or the skill of a physician to
discover their existence. One who has had an actual
experience for 15 years, with 100 employés, engaged in
a particular occupation, and who has had the oppor-
tunity to observe and has made observations, is certainly
competent to testify as to whether these patent results
follow such employment.

For these errors the judgment is reversed, and a new
trial is ordered, with costs to defendant.

MORSE, C. J., LONG and GRANT, JJ., concurred with
McGRATH, J.

MONTGOMERY, J. I concur in the result.