## NORTH AMERICAN ACC. ASS'N v. WOODSON.

(Circuit Court of Appeals, Seventh Circuit. November 27, 1894.)

### No. 187.

**1. EVIDENCE—RES GESTAE.**

Upon the trial of an action against an insurance company upon a policy insuring one K. against injury or death caused solely by external violence and accidental means, a witness testified that he and K. had been making some repairs to a gutter on K.'s house, using a ladder for the purpose; that after completing the same, and returning to the house, K. went out for the purpose of testing this work by putting water into the gutter, leaving the witness in the house; that he heard a grating sound on the side of the house, sounding like the fall of the ladder, and, through the window, saw K. on the ground, pale and half bent over; that he went to him, and K. said, "I fell from that ladder," and, a few minutes afterwards, "I fell right on my neck and shoulders." *Held*, that K.'s declarations of the cause of the accident were properly admitted as part of the res gestae.

**2. EXPERTS—HYPOTHETICAL QUESTION.**

It is reversible error to admit the answers of expert witnesses to hypothetical questions which assume the existence of facts of which no evidence is offered.

In Error to the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

This was an action by Archilaus M. Woodson, executor of C. C. Kemper, deceased, against the North American Accident Association, upon a policy of insurance. On trial in the circuit court, the plaintiff had a verdict, and judgment was entered in his favor. Defendant brings error.

W. H. Barnum, A. B. St. John, S. A. French, and D. W. C. Merriam, for plaintiff in error.

W. M. Jones, D. V. Samuels, and W. I. Culver, for defendant in error.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

BUNN, District Judge. This is an action brought by the defendant in error, a citizen of Missouri, against the North American Accident Association, a corporation organized under the laws of Illinois, and a citizen of that state, doing business and having its office at the city of Chicago, upon a policy of insurance dated October 6, 1891, issued by said association, insuring C. C. Kemper, then a citizen of Edgerton, Mo., now deceased, against the effects of bodily injury caused solely by external violence and accidental means. The policy, after providing for insurance against injuries of a temporary character, contains this provision:

"(6) Or, if such injury alone shall result in the death of the insured within ninety days thereafter, the association will pay $5,000 to his estate, if surviving, or, in the event of prior death, to the legal representatives of the insured members, according to the by-laws."

The declaration charges that during the continuance of the policy, on the 23d day of April, 1892, Kemper sustained bodily injury, of

the character defined in the policy, which resulted in his death on or about the 2d day of May, 1892, and demands judgment for the sum of $5,000. The defense is that Dr. Kemper did not come to his death as the result of bodily injury caused by external violence, but as the result of disease or suicide. A trial by jury resulted in a verdict and judgment for the plaintiff.

There are 25 assignments of error, but we do not deem it necessary to consider them all. The first one relates to the admission of the decedent's own declaration, made shortly after the supposed accident, as to the cause of the injury. The theory of the plaintiff's case is that the insured, on the 23d day of April, 1892, at his house at Edgerton, Mo., went upon a ladder at the back of his house for the purpose of fixing an eaves trough; that while on the ladder it slipped, and he fell to the ground, receiving an injury, from the effect of which he died on the 2d day of May following. The account of the supposed accident is shown by the testimony of W. B. Munford, in the following transcript from the record:

"It was in the afternoon of the 23d of April. Dr. Kemper and I were together. We talked about a gutter running along the west side of his house to this little portion of it which I was telling about,—about it leaking. He wanted to raise that little gutter so as to force the water towards the north end of the house. He took a piece of board about the length of that photograph, and measured it so as to set it on the corner of the house. Then we went outside, and took a ladder and some nails and a hammer, and put the ladder up against the side of the house, and Dr. Kemper went up the ladder with this little piece of board and nails and hammer. He nailed it there, and then came down the ladder and went into the house. When we got into the house, he said: 'I don't think that you set that gutter right. I don't believe you elevated it high enough.' 'O, yes, I am satisfied of that,' I answered. But he said: 'I don't think so. I am going to get some water and pour it into that gutter, and see.' He filled a cup with water, and went out the back door of the house, and went around the north side of the house, and came around, directly through the house, to the west room. Leading out from the west room was a window, and I saw Dr. Kemper go around the house when I was in this west room. I heard a grating sound on the side of the house; as a matter of fact, right at the house,—right at the window where we had left the ladder; and I heard a sound, a grating sound, on the side of the wall; sounded like the fall of the ladder on the ground; and through the window I saw Dr. Kemper, pale and half bent over. He kind of half straightened up and started around the house. I started hurriedly back through the house to him. He looked as though he was hurt. Getting into the door, I said, 'You are hurt, Kemper.' He said, 'I fell from that ladder. * * *' I saw that he was pale, and I put my hand on his shoulder and said, 'I think you are hurt very badly, Kemper.' He was standing perfectly still after he entered the door. I didn't see anything at first. I examined his head here (indicating the back), if I mistake not. He was standing there. He did not tell me where he had fallen, and I naturally examined the man, as that used to be my business. I have practiced as a physician. * * * I saw— I am not definite, for myself, whether it was on the right or left side, but my impression is that it was on the right side of the cheek, here, and face, over there (indicating), was a red spot, first fiery red, and puffed and red, and I said, 'You have hurt yourself,' and he said, 'Yes'; and I walked around then into the other portion of the house, and I said, 'Kemper, if you will sit down, I will go and get you some liniment, or something, to rub your neck for you.' He says, 'Yes, I fell on my neck and shoulders.' He said, 'I fell right on my neck and shoulders,' and I said, 'You had better let me get you some liniment, and rub you.' He said, 'No, no.' He would not permit me to do it. He says: 'I will get over it shortly. I am getting over it.' And we then proceeded to straighten up these rooms. Q. Did you go outside, and see if the ladder had

fallen? A. Not at that moment; not at that time. It was possibly an hour after I went out of the house; a half an hour after I went out of the house and saw it. I saw it before I went out of the house. Well, we went and straightened up these rooms I am telling you about,—these two rooms,—the back room and the front room. Dr. Kemper and myself had been straightening up things generally on that day; house-cleaning ever since morning; just straightening up the house. I was helping him as I had done for two or three years. I straightened up the back room, and went into the front room, and was fixing things there, and Dr. Kemper was lying around during all of that time, and I said: 'You had better let me do these things. I can do it.' 'No'; he insisted upon helping, you know. He went to get an old picture. It looked about three feet, I reckon, two feet, or about two and one-half feet,—and was going to hang it up. Then he set it down behind the chair, against the wall. On the chair he put the box. He was a short man. He was going to get upon that chair and hang that picture up. He got up onto the chair, and then upon the box, and then he reached down for this picture, and lifted it up to hang it up. He fell again right on the floor. I was in the room at the time piling on top of a bookcase a lot of old Puck's magazines, and one thing another. I turned to him, and I says: 'Kemper, I told you you were hurt, and you had no business to go on top of that box. I will do it myself.' I says: 'Keep away from these things. I want to hang the picture up.' He went into the back room, and I went to the cistern to get a drink of water. I don't remember doing anything more that day. It was pretty well along in the afternoon."

The witness also testified that the ladder was eight or nine feet long. Also, as follows:

"When we went to supper, Dr. Kemper sat down beside me, and I noticed that he sat down with difficulty. He was stiff when he sat down. He didn't say anything. We had our supper and got up to go. He said nothing about his injury at that time to any one. He had the appearance of a man who was stiffened up. He sat down with difficulty, and got up with difficulty. I stayed with him that night, and remained until Monday morning. Q. Now, state what his physical condition was up to the time you left him. A. I saw no change in the man. He was still stiffened up. He sat down with difficulty, and got up with difficulty. Q. To refresh your recollection, did you ever see him hold his head, or complain of dizziness, or anything of that kind? A. I do not remember about that. The condition was the same, as I remember it. I asked him Monday morning how he was feeling, and he said nothing to me. I asked him how he felt, and he said, 'As to the soreness on my back, it is all gone, but my neck and shoulders still hurt me.' That is all."

All the testimony in regard to Dr. Kemper's own declaration of the cause of the accident was objected to by defendant's counsel, admitted against such objection, and exception duly taken. The first assignment of error relates to the admission of these declarations, it being contended by the defendant's counsel that such testimony was incompetent. We think it was properly admitted as part of the res gestae, within the principles of Insurance Co. v. Mosley, 8 Wall. 397.

Seven assignments of error, numbered from the fifth to the eleventh, inclusive, relate to the admission of evidence of expert witnesses concerning the cause of Dr. Kemper's death, in answer to hypothetical questions framed upon a supposed state of facts not appearing in evidence at the time the questions were put, and not proven at any time on the trial. This testimony, against defendant's objection was introduced by means of depositions which had been taken before the trial, mainly in the state of Missouri. Several physicians residing in Missouri were examined, and their testimony

taken, presumably on the supposition that the supposed facts upon which the answers were predicated would be proven by means of other witnesses on the trial.   Some of these facts were proven, while others were not, but the answers were admitted by the court, the same as though all the facts stated in the hypothetical questions had been proven.   This we think was error for which the judgment must be reversed.   These several assignments of error are so much alike that it will not be necessary to notice more than two or three, though we are of opinion that they are each and all well taken.   All the material facts upon which the answers are predicated not being proven, it is impossible for the court to assume that the answers would not have been different if the assumed facts, which were not proven, had been left out of the hypothetical questions.   According to the eighth assignment of error, this question was asked the witness John E. Owens, a physician and surgeon residing at Chicago:

"Q. I will now read the question, and hear what you have to say to the jury in answer.   Suppose a vigorous, energetic, hearty, healthy man, of very cheerful and jovial disposition, forty-one years old on April 23, 1892, about four o'clock in the afternoon, should fall from or near the top of a ladder nine feet high, striking upon the back of the head and shoulders, either upon the ground itself, or upon some object' upon the ground, with sufficient force to cause, within a few moments, the lower part of the back of the head and neck to become very red, and look puffed up and inflamed, and the person himself to become pale and weak; and suppose that in about an hour after such injury the person should stand upon a chair to hang a picture, and, in the absence of any known cause, should fall off the chair upon the floor; and suppose that the man, ordinarily a hearty eater, ate but a little supper, and complained of pain in the back of his head and shoulders, accompanied by a stiffness of the head and shoulders; and suppose that thereafter the man made daily and frequent complaint about its hurting him to get up when he sat down, and about such pains and stiffness, accompanying such complaint at times by holding his hand upon the back of his head and neck, which continued up to the 1st of May, 1892; and suppose that after such injury the man's disposition changed, so that he became reserved, and very different in manner from what he had been before, and did not give the same attention to his business that he did before, and seemed to lose his energy that he had before, although he gave general attention to his business; and suppose that on the morning of May 2, 1892, he was found dead in his room, lying upon his face, at the side of a lounge, with a very slight cut at the corner of the eyebrows, and another at the corner of the mouth, and a bruise or contused wound, which appeared to be not of recent date, about an inch long and about a half an inch wide, on the back of his head, at the right side, upon or near the occipital bone; and suppose that by him, in his handwriting, was found the following, written upon the back of an envelope: 'My head feels very queer, especially at the base of the head, so queer, I do not mind to die, but now ., so inconvenient, good-bye.'   Now, I will ask you, doctor, in the absence of any other known cause of his death, what would you say caused it?   A. It would look like the injury was productive of his death. Q. That would be the probability, as you understand it?   A. I think so."

The facts assumed in the question, but not proven on the trial, were these, given in the language of the question:   (1) "About four o'clock in the afternoon should fall from, at, or near the top of a ladder about nine feet high, striking upon the back of his head and shoulders."   There is evidence that he fell from a ladder nine feet high, but none whatever that he fell from the top, or near the top, nor that he struck upon the back of his head.   (2) "And complained

of pains in the back of his head and shoulders. That thereafter the man made daily and frequent complaint about its hurting him to get up when he sat down, and about such pain and stiffness, accompanying such complaint at times by holding his hand upon the back of his head and neck, which continued up to the 1st day of May, A. D. 1892." None of these facts appear in the testimony. On the contrary, witness Munford testified that he said nothing about his injury at any time to any one. And W. H. Kemper, a brother, testified: "He did not say a word about suffering. I did not notice anything about him as to stiffness, or as to whether he was pale or not." (3) "And suppose that by him, in his handwriting, was found the following writing upon the back of an envelope," etc. There was no evidence that this envelope was found on Dr. Kemper. On the contrary, the evidence shows that his body was taken from the floor and placed on the bed at about 7 o'clock in the morning, and that some time in the afternoon (witness Hall says about 1 o'clock) this envelope was found on the floor of the room. This, as the evidence shows, was after the room had been visited by many people.

The question put to T. E. Potter, physician and surgeon, embodied in the ninth assignment of errors, is much like the preceding, except that it has this statement in addition:

"About an hour and a half or two hours after the first fall, he went to the bank of which he was cashier, and there complained of the shock and injury which he had received from the fall, complaining particularly of pain in the back of his head. He made the same complaint at the supper table, and afterwards, for eight days, complained of pain in the back of his head, frequently placing his hand to the back of his head, near the base of his skull; also, complaining of difficulty in arising from a chair while sitting down."

The answer to the question was, "Well, I should think that the fall was the prime cause of his death." We have searched the record in vain for any evidence of the above statement of fact.

In the eleventh assignment of errors, in a similar question put to witness C. H. Wallace, is the following assumed fact, in which there seems to be not a particle of proof in the record: "On the next day he hurriedly left the dinner table and went out into the yard, and sat down, and held his head in his hands, and complained of excessive pain in the back of his head."

The fifth assignment contains this statement embodied in a hypothetical question put to witness E. D. McCoffey, a physician and surgeon residing at Platte City, Mo., who knew Dr. Kemper in the army: "* * * And experienced sensations of dizziness, which continued, more or less, in the aggregate, for a week, and that on the night of his death the feelings mentioned were so intensified as to cause him to seek the aid of physicians. * * *"

In the sixth assignment is a similar statement of fact in a question put to witness William J. Overbeck, another physician and surgeon residing at Platte City.

The importance of these supposed facts is apparent when it is considered what the plaintiff's claim was,—that Dr. Kemper had met with a fall, which caused extravasation of blood into the base of the brain, producing death nine days afterwards. With an in-

jury of this character, dizziness would naturally be expected. Hence, the importance of proving a symptom which might, with some certainty of finding, be looked for in such a case. But we find no evidence of its existence in the record. These hypothetical questions were well and ingeniously framed to elicit the answers actually given to them, and the materiality and importance of the testimony can hardly be overestimated when we consider that the plaintiff's case rested in great part upon the testimony of these experts, who, in general, knew nothing about the case itself, and were giving their opinion upon an assumed state of facts as to the cause of the death; and when it is further considered that the evidence showed that from the time of the supposed fall from the ladder and the second fall in the house, up to the day of his death, Dr. Kemper continued to attend to his usual and daily business at the bank, and that the witnesses for the defendant, physicians and surgeons residing in Chicago, testified that in their opinion it was not possible that the fall from the ladder, causing extravasation of blood at the base of the brain, could have caused the death, but that in their judgment the death was more likely to be caused by poisoning, or possibly by a sudden attack of heart disease. Dr. Henry M. Lyman, professor of theory and practice of medicine in Rush Medical College, in answer to the same hypothetical question put to Dr. Owen, made this answer:

"I should state that I could not tell what was the cause of his death, from that statement. It was not certainly from the injury. There is nothing to indicate that the injury caused his death."

He further says, in answer to the question:

"Q. How do you physicians go about it to find out whether a man has, or has had, a hemorrhage? A. By observation of the symptoms that exist. When a hemorrhage takes place in the brain, there is paralysis following,—paralysis of some part of the body. That paralysis is the best sign of the injury,—that hemorrhage has taken place. If the hemorrhage is into one side of the brain, paralysis is on the opposite side of the body. Paralysis becomes apparent by the impossibility of moving the paralyzed parts. If hemorrhage takes place into the left side of the brain, the arm and leg will be paralyzed upon the opposite side of the body. Q. If a man had a hemorrhage in his brain somewhere on the 23d day of April, 1892, in consequence of having a fall, or anything else, is it your observation and experience and knowledge that that man would be able to go on and transact business,—his ordinary business,—with more or less attention, for a week, and then die of that hemorrhage? A. No, it is not. Q. Why not? A. Because he would have been disabled by the original injury and hemorrhage. An injury that would have been severe enough to produce such a hemorrhage would have paralyzed him, and rendered him incapable of going about, and he would have been laid up in bed entirely."

To the same question put to Dr. Harold M. Moyer, of Chicago, the following answer was given:

"There is nothing in the hypothetical question by which a man could predict an opinion, with any accuracy at all, as to how that death came about, except that, taking the facts hypothetically as they stand, one can absolutely say death was not the result of those falls."

The following question, which had been previously put to some of the plaintiff's witnesses, was then put to Dr. Moyer, with the answers following:

"Q. Now, Dr. Moyer, I will put to you the same question again, precisely as it was, with this addition: Suppose, at the hour of one o'clock in the morning of May 2, 1892, Dr. C. C. Kemper, spoken of in this question, crossed over the street from his house to the house of Dr. Lewis, and asked Mrs. Lewis for Dr. Lewis, and told her that he had done a foolish thing two hours before; that he had gotten upon a chair to get a book from the bookcase, and had fallen from the chair, and had struck his head against a box, and that his head pained him,—and while telling her this he had his hand to the back of his head, and that he desired her husband, Dr. Lewis, to make an examination of him, and that she told him that Dr. Lewis had gone into the country, and would not be back for some time, but that when he came back she would have him go over and see Dr. Kemper, and that Dr. Kemper replied, 'No, no, you need not mind. If I want him, I will come for him again,' and that then the Dr. walked back to the house (his house), and was found dead in the morning, at 7 o'clock of May 2d, on the floor at the foot of a sofa, a book (a magazine) near one of his hands, and there was found on the floor at about that spot, later in the day, the envelope on which was written the words in the handwriting of Dr. Kemper, being the words included in the hypothetical question, and in the hypothetical question read to you, which envelope and writing thereon I show you (handing witness envelope). Now, then, adding this new matter to my previous hypothetical question, and assuming that Dr. Kemper wrote what you see on that envelope, excepting these words, 'Exhibit A,' at the bottom,—now, what do you say to that enlarged hypothetical question? And, in the absence of any other known cause, what would you say caused his death? A. I should say, on the state of facts shown in this hypothetical question, the man probably died of some poison. Q. Was there other things from which he might have died, including the note and all? A. I don't think there is any one thing that this man could have died of, excepting some poison, including this note and all the other facts."

Further testifying:

"The most frequent of all causes of certain sudden deaths, including, perhaps, more than nine-tenths, are from heart disease. The next, perhaps most important, are poisons. The least of all is some injury to the brain. A hemorrhage into the brain the least frequent. I am basing my answer largely on my own experience."

This being the kind of case the plaintiff must make out,—that Dr. Kemper had had a fall which had produced extravasation of the blood in the brain,—the importance of the facts detailing the symptoms contained in the hypothetical questions becomes obvious. It is a proposition too simple to require any citation of authorities that the material facts assumed in a hypothetical question must be proven on the trial, or rather that there must be evidence on the trial tending to prove them. Otherwise, it is error to allow them to be answered. How can we say that either the answers to the questions or the verdict of the jury would have been the same if the statements contained in the questions, and not proved, had been omitted? Evidence of experts who are allowed to give an opinion is always attended with a sufficient degree of uncertainty and danger when founded upon an assumed state of facts which appear on the trial, or which the evidence tends to prove, and which the jury must find proven. If counsel can, in advance of knowing what he will be able to prove on the trial, frame his questions as he pleases, putting into them suppositious statements from his own invention and ingenuity, wholly unsupported by evidence, then the danger of this rather unreliable kind of testimony will be increased a hundred fold. Hovey v. Chase, 52 Me. 313; People v. Foley, 64 Mich. 148, 31 N. W. 94; Reber v. Herring, 115 Pa. St. 599, 8 Atl. 830; Fox v. Color

Works, 92 Mich. 243, 52 N. W. 623; Turnbull v. Richardson, 69 Mich. 400, 37 N. W. 499; Loucks v. Railway Co., 31 Minn. 526, 18 N. W. 651; Guetig v. State, 66 Ind. 94. Judgment reversed and case remanded, with directions to the court below to award a new trial.