WILLIAM LOUCKS *vs.* CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY.

March 17, 1884.

**Negligence—Traveller at Public Crossing held not Negligent.**—The plaintiff, driving upon a public street across a railroad track, was struck by a train of cars, the approach of which he did not discover until immediately before he drove his horses across the track. The view of the track in both directions was partially obstructed. The evidence going to show that the plaintiff was mindful of the danger and watchful, according to his reasonable judgment, to avoid it; that at the time when he might first have seen or heard the train, he had reason to suppose that no train was coming from that direction, while his attention to the track in the opposite direction was more apparently necessary; that the cars were even then close at hand, running at a high rate of speed, and he in a place where he could not safely turn his horses, nor hold them before the passing train,—it is considered that negligence was not conclusively imputable to the plaintiff by the law, but that it was for the jury to determine whether the plaintiff was negligent.

**Same—Running Train at High Speed through Village, without Signals.**—To run a locomotive and train of cars, which cannot be readily stopped, at a high rate of speed, and without any signal by bell, whistle, or otherwise, across a much-travelled public street in a village, where the crossing is dangerous to travellers by reason of obstructions concealing the approach of trains, no excuse appearing for the omission to give signal of its approach, is negligence, although there exists no statutory requirement respecting the giving of such signals.

**Same—Reliance on Presumption that Others will not be Negligent.** One who is called upon to exercise care to avoid danger from the acts of others, may, in regulating his own conduct, have regard to the probable

or apprehended conduct of such other persons, and to the presumption that they will act with reasonable caution and not with culpable negligence.

**Experts—Hypothetical Question not in accordance with Facts.**—The court instructed the jury to disregard the opinions of expert witnesses, based upon hypothetical statements of facts, if the jury should find the hypothesis to be not in accordance with the facts. *Held,* no error.

**Same—Value of Farmer's Labor.**—The plaintiff, having been a farmer for many years, and engaged in carrying on a farm, was competent to testify as to the value of his own labor. It was a proper subject for the opinion of witnesses.

**New Trial—Conduct of Counsel.**—The question of granting a new trial, because of the conduct of counsel, considered as being within the discretion of the trial court.

Appeal by defendant from an order of the district court for Fillmore county, *Farmer,* J., presiding, refusing a new trial after a verdict of $3,000 for plaintiff.

*Cameron, Losey & Bunn,* for appellant.

*J. D. Farmer* and *J. N. True,* for respondent.

DICKINSON, J.   The action is for the recovery of damages for personal injuries sustained by the plaintiff, by reason of a freight train of the defendant coming in collision with the plaintiff's wagon at the crossing of Section street over the railroad, in the village of Spring Valley.   We are to consider whether the case shows conclusively, and as matter of legal imputation, negligence in the conduct of the plaintiff, so that he should not recover for the alleged negligence of the defendant.   The following diagram shows the situation of the premises:

The depot buildings are east of Section street. The grade of the railroad descends both from the east and from the west as it goes towards the depot. The buildings shown on the diagram, standing on the west side of Broadway and on the south side of Main street,

prevent the traveller upon the street from seeing the railroad in the direction in which they stand.

A freight train, consisting of 21 cars, with the locomotive, bound east, had backed up from the station westward, a distance of 1,200 feet or more west of Section street, for the purpose of gaining headway to overcome the ascending grade east of the station. At about the time when this train was coming east again, the plaintiff, in his farm wagon, driving a span of horses, coming south down Broadway, turned east into Main street and drove to the Section-street crossing, intending to cross the track. As the plaintiff came into Main street, his view of the track south of him was unobstructed from a point a little west of the crossing up to the west side of Broadway, and, as he proceeded east on Main street, the line of vision to the railroad west of Broadway past the buildings standing on that street would be gradually extended until it was obstructed by the intervening of the livery barn and other buildings near Section street. When opposite those buildings, he could see the track to the westward 1,200 feet from the crossing. After the view in that direction was shut out by the buildings on Main street, he could not see up the track westward again until he came within a short distance of the crossing. At the distance of 48 feet from the place of collision he could have seen the track 187 feet west of that point, and at about 40 feet from the crossing the view westward became again unobstructed.

The evidence tends to show that from the centre or travelled track of Main street one could not see that part of the railroad extending about a quarter of a mile east of the crossing, and the view in that direction was obstructed, until, within a distance of a few feet of the track, one looking past the mill shown on the diagram could see the track to the depot and east of that point. The evidence tends to show that there were ditches on both sides of the travelled part of Section street, near the crossing, so that it would be difficult to turn a team there, unless it was done carefully and deliberately. The speed of this train as it returned eastward to the point of collision at Section street, as estimated by many witnesses, was from 25 to 45 miles an hour. The defendant's witnesses make it less, the mini-

mum estimate being 10 or 12 miles an hour.   No signal of its approach was given by bell or whistle, until, the danger of the collision being imminent, the whistle was sounded for brakes.

The plaintiff did not see the train as it backed up west of the crossing, and does not appear to have had any special reason to expect a train would be coming from that direction.   He testified that he looked at the track as he went from Broadway down Main street, and that, as he came near the livery barn, he looked backward toward the west, and neither saw nor heard any train.   When he was opposite this barn he was about 200 feet from the crossing, and could then see 1,200 feet west of the crossing, nor would this view become obscured until he came within about 166 feet of the track.   He testified that, after he passed the barn, going not faster than four miles an hour, he looked to the east, as he approached the crossing, to see if any train was coming from that direction.   When he could see past the mill, seeing no train, he turned to look again to the west, and saw the train very near to him.   His horses' heads were then about at the north rail of the three tracks, or about 10 feet from the place of collision.   He said that he was frightened, and, obeying his first impulse, he struck his horses, and they jumped forward across the track, and the locomotive struck the rear end of his wagon as it passed.   He testified also that he did not think 10 men could have held his horses, (in the face of the train as we understand him to mean.)   The wind was blowing from the east, and some noise was caused by steam at the elevator, near the crossing.   These facts lend reasonable support to plaintiff's testimony that he could not hear the approaching train.   The testimony of two other witnesses, (Baldwin and Seeker,) one of whom testified in behalf of the defendant, also corroborates the plaintiff in this respect.   The testimony of Baldwin also supports the plaintiff as to the fact that the train had not come within the view of the plaintiff, as he passed from Broadway to Section street.

The case thus outlined conduces to show that the plaintiff exercised watchfulness and care until he passed the buildings on Main street and came near the crossing on Section street.   It is probable that

the conduct of prudent men in approaching this crossing, after the view to the west had become obstructed, and as the line of the track to the east, which had until then been out of view, was coming within the range of vision, would be somewhat controlled by the previous observation of the track to the west, which might lead one to suppose. that no train was near at hand coming from that direction. Perhaps the most natural course of a careful man would be to look steadily to the east until his view should become somewhat extended, since he could have had no assurance that cars were not close at hand coming from that direction. Under such circumstances, the case is not one where the law conclusively imputes negligence from the failure to look to the west at the very instant when a view in that direction became possible, since, at the same instant, and perhaps more imperatively, attention was demanded in the opposite direction. The conduct of the plaintiff at that moment may reasonably have been regulated somewhat with regard to the fact that his previous observation had led him to suppose that no train was close at hand coming from the west.

Consideration must be given to the brief interval that had elapsed, since, if his evidence is worthy of belief, he saw the track clear for about a quarter of a mile in that direction; and, again, we must bear in mind that the distance between the point where he could first see the track to the west, after coming near the crossing, and the point where the view became open to the east, (at which time plaintiff did again look west,) is very small, perhaps some 10 or 15 feet. Going at the rate of four miles an hour, plaintiff would consume probably less than three seconds in passing over this space, and during that time he was looking to the east, where the track was just coming into view. As he looked again to the west the train was so close upon him, as the case shows, that danger was apparent, either in attempting to hold his team where they were, or to turn quickly upon the narrow roadway between the ditches, or in going forward. In such an emergency, only such reasonable conduct as men are capable of hastily determining upon and carrying into execution is required. Again, consideration is to be given to the absence of cautionary signals, which may have contributed to induce the plaintiff to suppose

that no train could be close at hand.   We shall have occasion to re-
fer to this subject again.

In brief, there is evidence, the credibility of which it was for the
jury to determine, that the plaintiff was constantly thoughtful of the
danger to be apprehended, and watchful to guard against it.  Whether
the fact was so, and whether the plaintiff's precautions to avoid dan-
ger were such as reasonable prudence demanded, under the some-
what distracting circumstances shown in the case, it was for the jury
to determine.   We cannot, as an imputation of the law, pronounce
his conduct to have been negligence.   *Kellogg* v. *N. Y. C. & H. R.
R. Co.*, 79 N. Y. 72;   *Continental Imp. Co.* v. *Stead*, 95 U. S. 161.

The court instructed the jury that, under the charter under which
the defendant was operating its road, it was the duty of the engineer
to sound the whistle or ring the bell at a distance of at least 80 rods
before reaching the crossing.   Our general statutes contain no such
requirement as is indicated in this instruction, and for the purposes of
the case we will assume that no such obligation was imposed by the
terms of the charter under which the road was operated.   Neverthe-
less, the defendant was not prejudiced by the charge.   It is a noto-
rious fact that all locomotives are supplied with whistles and bells for
the purpose of giving warning where that is necessary.   Independent
of legislative requirement, wherever the circumstances are such as to
render it dangerous to run a locomotive across a highway without
previously giving warning of its approach by bell or whistle, it will
be deemed negligence to omit to give such warning.   Ordinarily this
would present a question of fact for the jury; (see *Shaber* v. *St.
Paul, M. & M. Ry. Co.*, 28 Minn. 103;) but to run a heavy train,
which cannot be readily stopped, at a high rate of speed, and with-
out any signal by whistle, bell, or otherwise, across a much-travelled
public street in a village, where the crossing is admitted to be of a
character dangerous to travellers by reason of obstructions conceal-
ing the approach of trains, is so clearly dangerous that, no excuse
being shown for the omission, the law imputes negligence.   Such
were the undisputed facts in this case, and the court was justified in
instructing the jury that the omission to give reasonable warning by

bell or whistle was negligence.   See *Philadelphia, etc., R. Co.* v. *Stinger*, 78 Pa. St. 219, 225, 227; *L. & N. R. Co.* v. *Commonwealth*, 13 Bush. 388; *Philadelphia & T. R. Co.* v. *Hagan*, 47 Pa. St. 244; *Roberts* v. *C. & N. W. Ry. Co.*, 35 Wis 679.

Independent of statutory requirement, it could not be said, as a proposition of law, that such signal should be given at least 80 rods from the crossing.   What would be a proper and reasonable distance would be a question of fact, to be determined with regard to the circumstances.   But since it is not claimed in this case that any signal was given, and the proof is that none was given, the instruction, in so far as it may have been inaccurate, did not prejudice the cause of the defendant.   The only effect of the charge, as applied to the facts in this case, was that the unexplained neglect of the defendant to give warning by bell or whistle of the approaching train was negligence; and this we think was not error.

The court in its charge to the jury, speaking of the concurrent rights and obligations of the parties, said that "each party had a right to rely, at all times and under all circumstances, until the contrary appeared, that the other would use ordinary care and diligence to prevent a collision."   This language, when considered in connection with the rest of the charge, does not fairly bear the meaning which the appellant imputes to it,—that is, that each party might regulate its conduct with absolute reliance upon the presumption that the other would exercise ordinary care, and hence that the plaintiff might, relying upon this presumption, attempt to cross the track, when he perceived the danger of doing so, or that he might neglect to be watchful against possible danger.   The court added, immediately after the language above given, this: "To be a little more particular, it was the duty of the defendant   *   *   *.   But it was the duty of the plaintiff to approach the crossing at such a reasonable rate of speed, and to use all of his senses with such ordinary and reasonable care and diligence, as was required, under all the circumstances, to avoid a collision."   The court further and correctly instructed the jury as to the duty of the plaintiff in approaching the crossing, and that, if he omitted that duty, he could not recover.

The language to which exception was taken, when taken in connection with the rest of the charge, plainly meant no more than that each party, in regulating his own conduct, might have regard to the presumption that the other would also exercise reasonable care; and this involves no error. *Ernst* v. *Hudson R. R. Co.*, 35 N. Y. 9; *Reeves* v. *Delaware, etc., R. Co.*, 30 Pa. St. 454; *Langhoff* v. *Milwaukee & P. Ry. Co.*, 19 Wis. 489; *Kennayde* v. *Pacific R. Co.*, 45 Mo. 255. From the very nature of the case the measure of caution which a person should exercise to keep out of the dangerous way of a railroad train must be adopted with reference to the probable or apprehended conduct of those operating the train; and the exercise of reasonable caution, not culpable negligence, is ordinarily to be expected from others. We are satisfied that the jury were not misled.

· We think the hypothetical question put to Dr. Johnson embraces, substantially and fairly, the essential facts of the case, as shown by the evidence.

There was no error in the charge to the jury to disregard the evidence (opinions) of expert witnesses, based upon hypothetical questions, if the jury should find the hypothesis involved in the questions to be not in accordance with the facts.

It is claimed the court erred in allowing the plaintiff to give in evidence his own opinion of the value of his services for labor prior to the accident. The occupation of the plaintiff was farming, and had been for many years, he being engaged in carrying on a farm on his own account. It is not to be presumed that the jurors were all farmers, nor that they were qualified, without proof, to determine the value of a farmer's labor. It was a proper subject for the opinion of competent witnesses. ·.

In the course of the trial, the counsel for the plaintiff offered in evidence a certain document, and, in connection with the offer and against the objection of the defendant, stated and commented upon the contents of the document, in the hearing of the jury, and, after having done so, withdrew his offer. An exception was allowed to the conduct of counsel. We are not able to determine the motives which induced the conduct complained of, nor is it apparent that it

resulted in prejudice to the defendant. The granting or refusing of a new trial upon this ground was a matter proper for the exercise of the discretion of the trial court, and no reason is apparent for disturbing its decision.

The refusal of the court to communicate to the jury certain specific instructions, requested by the defendant, was justified by the fact that the general charge had fully covered the matter embraced in the requests.

There are no other questions presented which we deem deserving of special mention.

Order affirmed.

GILFILLAN, C. J., dissenting. I dissent. It is clear that this crossing is, to one coming from the north, very dangerous, requiring unusual care and watchfulness to avoid trains crossing either from the east or west. This is so from buildings on each side of Section street, near the track, cutting off a view of the track during part of the time when approaching it. It is clear, also, that plaintiff was perfectly familiar with it, as he was in the habit of crossing it frequently, and he must be supposed to have known the degree of care necessary to avoid trains. It may be assumed, though it is hard to believe, that as he came along Main street he looked to the west until the intervening buildings prevented his seeing the track, and saw no train. He may have thought he could calculate how long a train would take to reach the crossing from the farthest point west at which he could see one on the track up to the time he came to the buildings, and how long it would take him, at the rate he was driving, to pass the crossing. That, however, was not a sure precaution. Such calculations were liable to mislead, either from a train approaching more rapidly than he took into account, or his team going more slowly than he supposed; too liable to mislead to be prudently relied upon to the neglect of means that with absolute certainty would apprise him of a train coming from the west. When he came to a point forty feet from the track, he had only to look towards the west, and he would have seen the train and avoided the accident. To say that one approaches

such a crossing with due care when he relies solely on a precaution which the best observation and reflection would have shown him might not be entirely safe, when he knows there is an infallible means to avoid danger, requiring no time nor effort, and so obvious that ninety-nine men in a hundred would instinctively—involuntarily, as it were—resort to it, confounds, as appears to me, all notions of care in approaching such a danger. I do not overlook the fact that, as he approached, greater attention was required towards the east than the west, but the turning of his attention from the east to the west for a half second would have shown him the danger when 40 feet from the track. I think he was grossly negligent.