## ARTHUR A. LARSEN v. NORTHERN PACIFIC RAILWAY COMPANY.[1]

February 11, 1932.

No. 28,665.

*Davis & Michel,* for appellant.

*D. F. Lyons* and *Frederic D. McCarthy,* for respondent.

LORING, J.

The opinion on the former appeal of this personal injury action appears in 175 Minn. 1, 220 N. W. 159. The case was sent back for a new trial upon the ground that the evidence then before the court was not sufficient to support the verdict for the plaintiff. A new trial was had, and the court directed a verdict for defendant.

[1]Reported in 241 N. W. 312.

It took the view that the evidence in favor of the defendant was stronger than on the previous trial and that the evidence in behalf of the plaintiff was not as strong as before.

Plaintiff claims to have been injured November 26, 1925, at Livingston, Montana, by the blowing out of a spindle from a water gauge cock while he was firing a locomotive engine preparatory to going out on the road. The water glass or gauge on the locomotive consisted of a vertical glass tube connected at either end with the boiler by means of heavy metal gauge cocks, each of which contained a valve controlled by a spindle rotated by a handle in the form of a wheel. As stated in the former opinion, the spindle is approximately five inches long and one-half inch in diameter. The inner end is beveled so as to seat in the fixed part of the valve and thereby shut off or control the flow of water into the water glass. The outer end of the spindle passes through a packing nut, which is screwed to the main casting of the gauge cock assembly. This nut is packed with a composition of fabric and metal, which makes a tight joint around the smooth part of the spindle, and when the spindle is in a normal position prevents the escape of water and steam around the threads which control the position of the spindle in the packing nut and valve. The interstate commerce commission has not prescribed any special type of water gauge cock or spindle. In the valve here involved there were 18 threads upon the spindle and 10 threads in the whole in the packing nut into which the spindle fitted. More threads are on the spindle than in the nut in order to accommodate the spindle to the open and closed positions of the valve and to the slight variation in position of the packing nut due to variation in the thickness of the packing.

Cross-sectional view of portion of valve showing spindle inserted therein in normal position, that is three turns outwardly from a closed position (one half actual size).

As will be seen from the accompanying cut of the spindle as it screws into the packing nut, the water gauge assembly is a very simple appliance, the only movable part being the spindle, which controls the valve opening when turned by hand. The threads on the spindle are U. S. standard number 14 and are like those on any bolt, except that they project above the surface of the spindle shaft instead of being cut below it. The purpose of the water gauge is to permit the engineer and fireman to see the height of water in the boiler. Normally when testing the gauge the engineer closes the valve completely and then opens it three or four turns to let water from the boiler into the glass. The upper gauge cock is treated in like manner. There are also water gauge cocks passing directly into the boiler to check the accuracy of the glass.

The plaintiff claims he was injured by the blowing out of the spindle from the lower cock due to the force of the steam and

water pressure in the boiler behind it; that the spindle was defective in fit; and that the threads on it stripped under the force of steam pressure so as to permit the spindle to be blown violently against the right side of his head while he was in the act of putting coal into the firebox. The. defendant claimed that he was not so injured but that he staged the whole affair so that it would appear to be an accident.

The former opinion is of course the law of the case, and the sole question presented here is whether or not the plaintiff has so strengthened his case as to present a question of fact. This is principally determined by whether or not the condition of the spindle is such as conclusively to refute the testimony of the plaintiff's expert witnesses. On the first trial of the case the jury did not have before it in disassembly the spindle, packing nut, and water gauge cock. In that case the identical locomotive, with the spindle and the gauge cock in place with steam up, was introduced in evidence; whereas on the second trial the water gauge cock and spindle were taken from the engine and introduced in evidence and are here before us. The plaintiff introduced expert testimony to the effect that the spindle was defective and dangerous and likely to blow out if installed in an engine; that its condition indicated that the spindle had been blown out; and that certain worn threads thereon indicated that they had been stripped in the process. One of the defendant's witnesses, an engineer named Fisher, also admitted that the spindle in its condition at the time he saw it at the second trial was not suitable for use in an engine. He was the engineer who on the day previous to the alleged accident had inspected and used the locomotive and had found this spindle tight and in "first class condition" for service. He also saw the spindle the day after the alleged accident and found it in like condition. He said it had been much worn since then by manipulation in connection with the trial. Micrometer measurements sustained this statement.

The evidence introduced by the defendant, much of it by people not in its employ, was well nigh conclusive that the plaintiff was not injured but was simulating or attempting to simulate paralysis;

and that, taking advantage of the open cab window while the engineer was on the other side of the engine and no one was looking, he reached from the window to the gauge cock and unscrewed the spindle to a point where it was blown out; that he then dropped to the ground and lay there simulating unconsciousness. It is significant that all of the many witnesses who saw and handled him immediately after the alleged accident found his clothes dry, notwithstanding that with the spindle out the gauge cock discharged steam and boiling water at the rate of a gallon a second into the cab and directly toward where plaintiff claimed to have been standing. In the position in which plaintiff says he was, he would have been drenched with steam and boiling water. He claims to have been hit on the right side of his head (causing paralysis on his left side) although in the position he claims to have been his left side would have been toward the gauge. He also claims to have lost consciousness immediately after seeing the spindle on the cab floor and does not know how he got out of the cab to the ground, where he was found lying stretched out on his back. This was a drop of nine feet, but plaintiff had no bruise on his person nor was he burned or scalded. His glasses were in place and neither broken nor bent. A wet glove was found near where he lay. In the hospital and elsewhere he was seen by many witnesses to use his left arm, which he claimed to be paralyzed. Many other circumstances tended to support defendant's theory, which it claims is conclusively proved. Much of this testimony was given by plaintiff's former friends and associates. However, as we dispose of the case, we do not need to pass upon the question of the force to be given to this evidence.

The defendant claims that the physical condition of the spindle and of the packing nut as now introduced in evidence is such as to refute completely and conclusively the evidence that the spindle blew out. The threads on the spindle project above its smooth stem, and the three innermost threads turn past the threads on the packing nut when the valve is closed. Consequently they become worn by their contact with the composition metal and fabric packing,

which necessarily fits snugly around the smooth part of the spindle. Whenever in the process of testing the gauge the valve was closed, these three innermost threads would be in contact not with the nut but with the packing referred to. They appear quite clearly to have been worn but do not at all present the appearance of stripped threads. There were still 15 good threads upon the spindle. Obviously no more than ten spindle threads could be engaged with the nut threads at one time. Had the spindle been made without the three innermost threads which show wear, it would have been just as serviceable. Upon actual trial in the same packing nut under the same head of steam as that which was on the locomotive at the time of the alleged accident, the threads in their present condition held this same spindle in place.

In order that the valve be opened sufficiently to permit the gauge to function properly, it was necessary to turn the spindle only one and a half to three turns. Experiments with this spindle showed that the valve had to be opened four or five turns before steam began to leak around the threads. This would continue until at nine and one-half turns enough steam would leak through to fog the gauge. The safety valve would pop off at a steam pressure of 182 pounds upon the boiler. At this pressure only 36 pounds was bearing upon the spindle. Experiment demonstrated that if only one of the outer 15 threads of the spindle was engaged it would resist many times that pressure.

There could be no occasion for the plaintiff to unscrew the valve farther than to permit the water to come freely into the gauge. On the occasion in question he says that he did not touch the handle of the valve but did observe the water gauge, and that there was no steam coming out of the lower valve. From the fact that no steam would leak through the threads until the spindle was turned out or opened four or five turns and that from there on the steam leaked continuously, the inference is irresistible that when the plaintiff observed no steam leaking from the valve it was not opened more than four or five turns, and that in that position there would be nine or ten full threads of the spindle engaged with the ten threads of the packing nut. In this position the experiments demon-

strated that the spindle here involved would stand many thousand pounds pressure before it would blow out.

It must be borne in mind that the question before us is not whether the spindle in its present condition is safe for operation. The question here presented is whether or not its condition is such that it is physically possible that it blew out on November 26, 1925. Next to the three worn threads already mentioned, the threads on the spindle are smaller than the outer ones by some few thousandths of an inch; and when the valve is unscrewed to the point where only these inner threads are in contact with the nut, much steam would pass the threads. Fisher testified that he found the valve in "first class" condition on the day before the accident and on the day after; that on the day after the accident the threads did not appear to have been stripped. He took the engine out on November 25, after an especially close inspection due to a roundhouse overhauling. He did not say that the present condition of the spindle indicated that it had been blown out. Micrometer measurements showed that the spindle had been subjected to much wear during the second trial. The fact that Fisher considered the valve too much worn for service by the manipulation to which it had been subjected since the first trial does not however tend to prove that it blew out in 1925. Had it done so then and the threads stripped off in the nut as claimed by plaintiff's experts, the new spindle could not have been screwed into the nut without first removing the stripped threads. The undisputed testimony shows that the new spindle was inserted without difficulty and the engine put into immediate service. The condition of the threads in the nut does not indicate any stripping, nor do the 15 outer threads on the spindle itself so indicate. As said in our former opinion, the federal boiler inspection act only requires that this spindle be safe when in its normal position.

We cannot resist the evidence of our own senses that when the spindle is in a normal position these threads are even now in a condition to resist any pressure that might be put upon them by the water and steam in the boiler, though they might leak some steam

when turned out four turns or more. Certainly the present condition of the spindle clearly demonstrates that it has not blown out from any normal position. No amount of expert opinion could convince reasonable minds against the visible condition of the spindle. We therefore conclude that the physical condition of this spindle and nut are such as conclusively to contradict the opinions of the plaintiff's experts and to demonstrate that the spindle did not blow out. In our opinion, reasonable minds functioning judicially could not differ as to that conclusion.

In Karras v. G. N. Ry. Co. 167 Minn. 140, 208 N. W. 655, a case was presented to this court which was fully as strong for the plaintiff as the one before us now. This court there held that the physical facts demonstrated that the plaintiff did not suffer his injuries in the manner described by him. In Larson v. Swift & Co. 116 Minn. 509, 134 N. W. 122, this court arrived at a like conclusion in a case where an eyewitness testified in support of the plaintiff's theory.

It follows that there is no evidence that any violation of the federal boiler inspection act or other fault on the part of defendant caused plaintiff's alleged injury, and the trial court was right in directing a verdict.

Order affirmed.

DIBELL, J. (concurring specially).

On the former trial the evidence was held insufficient to sustain the verdict rendered for the plaintiff. It is no stronger now—perhaps weaker. Under the familiar rule the order should be affirmed.

HILTON, J. (concurring).

The former opinion established the law of the case—that the evidence was insufficient to sustain the verdict returned in plaintiff's favor. We cannot say that at the second trial plaintiff's evidence was strengthened to such an extent as to require a reversal here.