# ANNIE O'CONNOR v. CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY AND ANOTHER.[1]

December 8, 1933.

Nos. 29,626, 29,638.

[1]Reported in 251 N. W. 674.

*Frank J. Wright, A. L. Janes, Paul J. McGough,* and *Nathan A. Cobb,* for appellant Great Northern Railway Company.

*F. W. Root, C. O. Newcomb, A. C. Erdall,* and *Daly & Barnard,* for appellant Chicago, Milwaukee, St. Paul & Pacific Railroad Company.

*Davis, Michel, Yaeger & McGinley* and *John I. Davis,* for respondent.

*HOLT, Justice.*

Action for wrongful death caused when a passenger train of the defendant Great Northern Railway Company collided with a freight train of the defendant Milwaukee Railway Company at Lurgan crossing, about four miles north of Wahpeton, North Dakota, the decedent being the fireman on the locomotive of the Milwaukee road. There was a verdict against both defendants. The Great Northern Railway moved for a new trial on the minutes of the court, and appeals from the order denying its motion. It did not make the Milwaukee road a party to the appeal. The latter, on a settled case, moved in the alternative for judgment notwithstanding the verdict or a new trial, and appeals from the order denying the motion. The Great Northern Railway is made a party to this appeal.

For brevity the two defendants will be designated as the Great Northern and the Milwaukee. The Great Northern track runs practically south from Fargo to Wahpeton. The Milwaukee track to Fargo is east of the Great Northern track out of Wahpeton until 3.8 miles north thereof, where, at an angle of 31 degrees, it crosses the Great Northern at what is known as the Lurgan crossing. Since 1923 the railroads have run their trains over this crossing in accord with the electrically operated automatic signal system installed and maintained under their agreement. The signal is on a tower or mast, and is given by means of an arm which moves from a horizontal position to one of 45 degrees on one road and 90 degrees on the other. When so moved from horizontal upwards it means for the train approaching to proceed over the intersection. The electric current has to be applied as the force to raise the arm. When the current is cut off the arm by gravity drops to horizontal. In horizontal it means to stop short of the crossing. This tower or mast having the movable arm is called the home signal. On both roads, as a train approaches the crossing from either direction, the mast or home signal is found on the right-hand side of the track about 600 feet, in round numbers, before reaching the crossing. On both roads, about a mile in each direction from the crossing, are

contact points so arranged that from the time a train strikes that point or area the electric current is turned on to the home signal ahead and its arm is raised, but the current is cut off from the other three home signals so that no train approaching them could get a proceed signal. When the train which made the contact reaches its home signal the arm drops to horizontal, and neither it nor any of the other three home signals can be raised until the first train is past the crossing. On the Great Northern the distant signal is a part of its block system and corresponds to its contact point. The Milwaukee has its distant signal 3,636 feet from the crossing. This signal serves only to remind the engineer that the home signal is near.

On January 30, 1932, a Milwaukee freight train of 11 cars approached the Lurgan crossing going towards Fargo at a speed of 18 miles per hour and was struck back of the cab by a southbound locomotive of the Great Northern hauling a passenger train. The time of collision was 5:54 p. m. The temperature was 18 degrees below zero. The atmosphere was clear and objects visible for a mile or more. The Great Northern train was known as the *Empire Builder*. The headlights and the lights in the cars were lit. The train was behind time and was running not less than 40 miles an hour when it struck the Milwaukee. At that speed it could not be stopped in less than 1,500 feet. The freight train could have been stopped at its speed in about 200 feet. The fireman on the Great Northern was killed. Both the engineer and the fireman (O'Connor), the only persons on the locomotive of the Milwaukee, were killed. The engineer of the Great Northern, Mr. English, testified. In his cab he could not see the approaching freight train. His fireman was attending to the fire when the Great Northern home signal was passed. O'Connor from his position in the cab could have no view of the approaching Great Northern train. The engineer of the Milwaukee could have had a view from his cab. The temperature was severe enough to frost the windows on the locomotives. It appears that the signal system was installed and maintained by the Great Northern. Periodic inspections were made by both companies. Plaintiff's right of recovery against either railroad cannot

in our opinion be affected by any agreement existing between the railroads with regard to installation, maintenance, or inspection of the automatic signal system, and such agreement is laid out of view. It does, however, appear that when the signal system was put into operation the railroads agreed that freight trains should not cross Lurgan crossing at a greater speed than 18 miles and passenger trains at a greater speed than 25 miles an hour.

The appeal of the Great Northern challenges two rulings excluding testimony.

One Laib, the news agent on the passenger train, was called by the Great Northern and was asked to state what the engineer, Mr. English, said when seated, hatless and nervous, in the baggage car four or five minutes after the collision. What he said was not in response to any question but was said in the hearing of Laib and others. The Great Northern offered to show that English said: "I wonder what the Milwaukee was doing out on the crossing because I had a clear block." On the objection of the Milwaukee the objection was sustained. English had testified fully and had been cross-examined by both plaintiff and the Milwaukee as to what he saw and did on approaching the crossing. The proffered testimony was to corroborate English. It is contended that the statement was admissible as *res gestae.* It related to a past event. There had been some time for reflection. It was a self-serving statement as far as the Great Northern, the employer of English, was concerned. It was for the trial court to say whether the statement came within this definition:

"The utterances must spring out of the transaction, must be spontaneous, generated by an excited feeling which extends without break or let down from the moment of the event to the moment of the utterance, and under such circumstances as to reasonably preclude the idea of calculation of deliberate design." Clark v. Davis, 153 Minn. 143, 146, 190 N. W. 45, 46.

The trial court must determine whether the declarations are admissible as *res gestae.* O'Connor v. C. M. & St. P. Ry. Co. 27 Minn. 166, 6 N. W. 481, 38 Am. R. 288; Lambrecht v. Schreyer, 129 Minn.

271, 152 N. W. 645, 646, L. R. A. 1915E, 812; Roach v. G. N. Ry. Co. 133 Minn. 257, 158 N. W. 232, 234. In the Roach case it is said [133 Minn. 260]:

"In reviewing the trial court's ruling this court defers to its determination of the preliminary facts bearing upon the propriety of receiving the testimony. To this extent its admissibility is within the sound judgment of the trial court."

In Lambrecht v. Schreyer, 129 Minn. 271, 275, 152 N. W. 645, it is said:

"If the statement is made under circumstances bringing it within the rule of res gestae, it is competent whether favorable or unfavorable to the person making it, since it is received, not as an admission, but as testimonial evidence."

While this is so, the situation here is much like the one in Perkins v. G. N. Ry. Co. 152 Minn. 226, 188 N. W. 564, 567, where the plaintiff tried to corroborate his testimony by testifying to declarations he made when aid arrived after his injury. There the court said [152 Minn. 234]:

"So far as we have discovered, it has never been held that a party may bolster up his case by testimony that he made a self-serving declaration so closely connected with the injury he received as to be part of the res gestae, and a court should be reluctant to adopt a rule of evidence which would tempt a party accidentally injured to make evidence for himself. * * * In no state has the res gestae doctrine been extended farther than in Minnesota. The extension now proposed would not serve the purpose of getting at the truth, which is the sole end towards which all rules of evidence should be directed."

Here English was the servant of the Great Northern. He had testified that the signal was for him to proceed. There was no good reason why this testimony should be corroborated by proof of a declaration by him to the same effect made several minutes after the collision. The situation here is more like it was in Schendel v.

C. M. & St. P. Ry. Co. 158 Minn. 378, 197 N. W. 744, than in Linderoth v. Kieffer, 162 Minn. 440, 203 N. W. 415. We deem the ruling not error under the situation shown.

The other error assigned upon the rulings is the exclusion of the conversation between the Great Northern fireman, killed, and English regarding the signal, it appearing that it was the practice of the enginemen to repeat the proceed signals to each other. This talk between the enginemen related to a matter of past daily routine when neither had any thought of an impending collision. It was pure hearsay.

The Great Northern also contends that the verdict against it is not supported and is contrary to law. The contention appears not well founded. Its own testimony shows that it struck the Milwaukee train going at a speed of not less than 40 miles an hour. Its agreement with the Milwaukee was to not run its passenger trains across Lurgan crossing at a greater speed than 25 miles per hour; and the testimony of experienced engineers was that it was not safe to cross at a higher speed. When it is also considered that both fireman and engineer had a duty to observe the crossing signal, and an effective observance would not be limited to the distant signal (block signal) on the Great Northern, but should concern itself with the home signal, which could not well be observed at that time of the day from the distant signal, but might require observance until so near that there could be no mistake, the jury could find that the fireman failed in this when he went to work on the coal stoker while approaching the crossing. Had the fireman remained observing the home signal he would have been in as good position to see the Milwaukee train as was the latter's engineer to see the Great Northern. The jury could also find that English ran his home signal, despite his testimony, from the presumption that the Milwaukee enginemen did not contemplate suicide; and the jury could find that they had the signal to proceed notwithstanding that English testified that he had. The evidence sustains the verdict against the Great Northern.

The Milwaukee's first claim is that no negligence was proved against it, and hence there should be judgment notwithstanding the

verdict. This is based on the conceded fact that its train came within the contact area before the Great Northern, and the presumption is invoked that its enginemen, now dead, did their duty and exercised due care in running the train and must have approached the crossing under a proceed signal. And it is said that the Milwaukee inspected the system a short time before the collision and found it functioning properly. It is presumed to continue in that condition. But opposed is the testimony of English that he was running under the proceed signal. That could not be so if there had been no break in the system. We have to bear in mind that the main machinery of this automatic signal system was contained in a box at the intersection, which was entirely destroyed in the collision. The expert testified that the system had 183 parts; and, if the system failed in this instance, it is impossible to prove that it did so or to account for its failure to function. The sum and substance of the expert's evidence is that the system was so arranged that by the entry of a train within the contact area the electricity was cut off from all home signals except the one nearest that train, and the power would remain off until the whole train had passed the contact area. On the home signal nearest such train the electricity would be cut off when the front wheels came opposite such signal, so that no one of the home signals could be moved from horizontal until that train had passed out of the contact area. But the jury were not compelled to accept Mr. English's testimony that he had the proceed signal, or to conclude that there was a break in the system, or that the Milwaukee ran its home signal, and could still find the engineer of the Milwaukee negligent. The testimony of an experienced engineer shows that at crossings the locomotive engineers may not wholly rely on automatic or other signals. They must use their eyes. The jury could find that the engineer of the Milwaukee could have observed that the Great Northern train was running its home signal in time to stop the freight train before it got into the crossing. It could also be found that plaintiff's intestate could not ascertain that fact from his position on the locomotive. Therefore, it must be held that the evidence justifies the verdict that the negligence of the engineer caused

or contributed to cause O'Connor's death. A claim is made that O'Connor assumed the risk of the signal system failing. To this it may be answered that the burden to prove assumption of risk was on the Milwaukee, and it rather insists that there was no proof of such failure. We think that is true.

This was a collision at a crossing of two railroads. It is self-evident that it occurred through the negligence of either one or both men on the Milwaukee locomotive, or of one or both of those on the Great Northern locomotive, or by the concurrent negligence of one or both men on one locomotive with that of one or both on the other. The evening was very cold. The cab windows were frosted. The Great Northern engineer was striving to make up lost time. Men do sometimes become so interested in achieving the object sought that other matters that should have challenged their attention go unheeded. Whether that occurred here and who of the crew failed in duty was for the jury. We think the Milwaukee is not entitled to judgment notwithstanding the verdict. The industry of counsel has marshaled a number of well considered cases, in this and other courts, holding that verdicts cannot be permitted to stand when demonstrably opposed to physical facts or principles of mechanics or natural laws, such as Larsen v. N. P. Ry. Co. 185 Minn. 313, 241 N. W. 312, and citations therein; American C. & F. Co. v. Kindermann (C. C. A.) 216 F. 499; Chybowski v. Bucyrus Co. 127 Wis. 332, 106 N. W. 833, 7 L.R.A.(N.S.) 357. Also that the one who seeks recovery under the federal employers liability act must prove the negligence alleged. It cannot be left to conjecture or guess. C. M. & St. P. Ry. Co. v. Coogan, 271 U. S. 472, 46 S. Ct. 564, 70 L. ed. 1041. And again, there is a presumption that one accidentally killed in the performance of his duty was performing such duty with due care and regard for his own life. Quinn v. Zimmer, 184 Minn. 589, 239 N. W. 902; T. & P. Ry. Co. v. Gentry, 163 U. S. 353, 16 S. Ct. 1104, 41 L. ed. 186. While these principles, without direct opposing evidence, persuasively may go to establish that the Milwaukee did not run the signal, it leaves a question for the jury whether or not the Milwaukee engineer in the exercise of proper care should have seen that the Great Northern was in a

position where a collision impended unless he stopped the Milwaukee. Neither engineer made any attempt to stop or even to slacken speed before the crash. So if by applying the principles just referred to we were to conclude that the Milwaukee approached the crossing under the proceed signal and the Great Northern ran its stop signal, we still think it was for the jury to say whether the Milwaukee engineer was negligent in failing to note and avoid the peril created by the Great Northern train. The country was level. There were no obstructions to hide the view of that train from the engineer of the Milwaukee. The conductor of the Milwaukee testified that it was daylight. In our opinion there was evidence from which the jury could find that the legal presumptions of proper discharge of duty by the Milwaukee engineer and of due care for his own safety were met and overcome. Hence there should not be judgment notwithstanding the verdict. But we are also of the opinion that it was for the jury to determine whether the Milwaukee ran the signals. As against the presumption in favor of Milwaukee enginemen, there is the positive testimony of English that he had the proceed signal, which he could not have had with the Milwaukee first inside the contact area if the signal system functioned. This would lead to the conclusion that there was a break somewhere in the system affecting the Milwaukee, and hence its home signal must have been at stop. The expert's evidence is that it was not possible to have two home signals at proceed at the same time. It is true, the expert was unable to point to any defect, because of the destruction of the main parts of the system; nor did he explain satisfactorily, or at all, how, if there was a break somewhere, the Great Northern home signal could move to proceed with the Milwaukee train first in the contact area. But there was the evidence of English that he had the proceed signal, and we cannot say on this record that such evidence is overcome by established physical facts or the operation of natural law or the presumptions referred to. So the issue of whether the Milwaukee ran the signal must be left to the jury. In our opinion this is not a case where one of two issues of negligence submitted to

the jury has no supporting evidence as in Lindemann v. C. R. I. & P. Ry. Co. 154 Minn. 363, 191 N. W. 825.

The Milwaukee insists that as far as concerns both its engineer and fireman the crossing, having an automatic signal system, must be made according to the indications of such signals and there is no duty to look for or heed other trains approaching to cross. Hence it objected to the introduction of its rules requiring enginemen at all times to be vigilant for the safety of their trains and not to rely wholly on signals. No error occurred here. The rules received required no more than good sense and due care demand. Where railroad tracks cross care and precaution must be used to avoid the peril of collisions. Nor was there any error in the charge of the court in reference to this subject. Of course the Milwaukee engineer was not required to anticipate that the Great Northern would run its train onto the crossing against signals or in a negligent manner. Loucks v. C. M. & St. P. Ry. Co. 31 Minn. 526, 18 N. W. 651. But if the rules of the company and due care required him to be observant of the crossing and he realized that the Great Northern was attempting to cross, heedless of the presence of the Milwaukee, he could be found guilty of negligence if he did not attempt to avoid the collision.

In the charge on the subject the court reminded the jury more than once that there was no testimony that the Milwaukee engineer saw the passenger train, and also called attention to the fact that a locomotive engineer, while under the duty to observe signals and keep a lookout, could not keep a constant lookout because he has other duties to attend to; and then, after stating the claims of plaintiff against defendants and specifically the alleged negligence of the Milwaukee engineer, the charge proceeds:

"If the engineer of the Milwaukee train, Ostrander, was negligent in either of the respects charged, the defendant Milwaukee would be liable and responsible for any consequences naturally flowing from his negligent conduct. I do not say the company would be liable, but, as I have stated, I will say if he, under the circumstances, must or could have seen the train and did not take

heed of the train, then I will say you will take that into consideration in determining whether the Milwaukee would be liable and responsible for the consequences flowing from the negligence of the engineer in that respect. On this question of the claimed negligence of the Milwaukee engineer in the respects just stated, you are to take into consideration all the evidence, including the signal system, the position of the signals, the position and duties of the Milwaukee engineer, the topography of the country, the view of the entire situation, and then determine from all of these facts and any other facts in evidence bearing on these questions whether the engineer of the Milwaukee train had any duty to either look for an approaching Great Northern train or to stop his train if he saw such Great Northern train approaching. If you find that the Milwaukee engineer did have a duty in either of these respects and that he failed to comply with it, then you would determine whether such failure constituted negligence."

We think the above quotation refutes the contention that the charge directed the jury to find the Milwaukee engineer negligent, and that therefore a new trial must result under Ring v. Minneapolis St. Ry. Co. 173 Minn. 265, 217 N. W. 130.

The complaint of the statements in the charge that "generally speaking, the train movement over the crossing was and is governed by signals," etc; and that if the jury found that the negligence of the Milwaukee, "in whole or in part, was the proximate cause of" the death of plaintiff's intestate the Milwaukee would be liable, we consider too technical and in no wise liable to be misconstrued to the prejudice of the Milwaukee. The same may be said with regard to the court's statement of O'Connor's contributions to the support of his family. The profit made on the sale of his home could not be considered in any other way than as evidence of prudence and thrift. So were his past contributions out of his salary. Neither could be received except as indications of future contributions to his family. We cannot think the jury could understand the court to "capitalize" in the verdict the $1,200 which decedent had obtained in the sale of his home and had used for the family support.

The court might well have given Milwaukee's request No. 3; but the equivalent thereof had been given in slightly different form. Request No. 5 is so specific that we find no evidence which would justify us in holding it error to refuse to give it. Had the request been to the effect that the Milwaukee enginemen could approach the crossing on the assumption, until the contrary appeared, that the Great Northern engineer would be controlled by the signals and would operate his train at such reasonable speed as to be able to stop before danger of collision, it should have been given. Hollister v. Hines, 150 Minn. 185, 184 N. W. 856.

We do not consider the rulings on evidence so prejudicial to the Milwaukee as to entitle it to a new trial. It has already been said that rules Nos. 105 and 927 of the Milwaukee were properly admitted, and really demand no higher duties of those in charge of trains than the law requires apart from rules. The general superintendent of the Milwaukee was called as a witness by the Great Northern to identify the rules under which the enginemen of the Milwaukee operate and was cross-examined by both plaintiff and the Milwaukee. He naturally qualified as an expert with respect to operation of trains, the meaning and applicability of the rules. And it is quite true that in some instances answers were elicited which properly should have been left to the jury. But we can in that see no harm to the Milwaukee. Certainly its superintendent would not willingly announce a conclusion to the injury of the Milwaukee.

We discover no error warranting this court in awarding a new trial to either appellant.

The orders are affirmed.