# W. R. SPENSLEY, EXECUTOR OF THE ESTATE OF A. C. SCHIRMER, v. OLIVER IRON MINING COMPANY AND OTHERS.[1]

February 18, 1944.

No. 33,442.

[1]Reported in 13 N. W. (2d) 425.

452

*Thomas H. Strizich, Henry J. Grannis,* and *Lewis, Underhill & Sher,* for appellant.

*W. K. Montague, Elmer F. Blu, Clarence J. Hartley,* and *John M. Gannon,* for respondents.

THOMAS GALLAGHER, JUSTICE.

This action, originally brought by A. C. Schirmer to recover $250,000 from defendants for alleged services performed by him on their behalf, is based upon both an express and an implied agreement covering work in connection with the acquisition of surface rights in the Pillsbury and Southern Additions to the village of Hibbing.

At the close of the testimony the court directed a verdict for all the defendants on the implied contract action because barred by the statute of limitations, and in favor of all the defendants except the Oliver Iron Mining Company on the express agreement action, on the ground that plaintiff had failed to prove such defendants parties thereto. Subsequently the jury disagreed and was discharged. Thereafter the court granted the motion of the Oliver company for judgment notwithstanding such disagreement. From the judgment entered pursuant thereto, this appeal is taken. Schirmer subsequently died, and W. R. Spensley, as executor of his estate, has been substituted as plaintiff herein.

The record discloses the following facts. In 1929 and for some years prior thereto, plaintiff was engaged in the plumbing and heating business in Hibbing. He testified that in the spring of that year he had a conversation with P. J. Ryan, agent of the Lake Superior Industrial Bureau, an association comprised of representatives of the various defendants and other mining companies, whose function was to audit and report expenditures of governmental subdivisions on the Iron Range. Paraphrased, plaintiff's conversation is substantially as follows:

I asked Mr. Ryan whether the mining companies were prepared to do something in reference to the purchase of the property in North Hibbing (the Pillsbury and Southern Additions to Hibbing

isolated by defendants' mining operations on the north forty adjacent thereto). He said "Yes" and asked if I had thought anything over about it. I told him that if the mining companies would be willing to pay on a basis of what the properties were worth before they became damaged or depreciated by the mining operations, most likely the people would sell at a reasonable price, provided they got enough money to rebuild these properties in South Hibbing—on a replacement basis. I told him I thought we could make an appraisal that would represent the replacement of those buildings in the condition they would have been in if they had been kept in a fair state of repair. Mr. Ryan said he would talk that over with his people, that that was something unusual and would probably solve the situation. Mr. Ryan suggested that I take charge of the plan and the appraisal. He said, "Why, Al, I think you are the man for the job." He thought that the people would have confidence in me.

I finally asked him if the mining company was going to pay for this, and how, and he said, "Why, certainly, if a plan could be worked out whereby contracts could be gotten from these property owners that would not exceed $5,000,000 and if they could get at least 75 per cent or about 75 per cent of the property owners to sign an agreement to sell their property, that no doubt * * * the mining companies would buy the property." He said that as far as making the appraisal, any labor connected with it could be put on the village payroll and that could be taken care of all right. I said, "What about the other expense?" He said there wouldn't be an awful lot, that I would be able to collect some of that from the property owners. He said he thought the mining companies would be willing to pay five percent on the basis of the appraisal price. Later he said the mining companies had agreed to pay five percent as we discussed. I asked him how it was to be paid, and he said that unless they used the appraisal it would not be of any use to them, and that I would be paid out of tax savings. I asked him, "Anything further?" and he said I should go to work any time, so I did.

These conversations were denied by P. J. Ryan. No written agreement or memorandum was submitted to substantiate them, and no evidence was presented to establish Ryan's authority to act as agent for defendants or any of them in conducting such negotiations or in making such an agreement.

Shortly thereafter, in June 1929, plaintiff, together with one J. H. Ryan and Ray Remington, formed an association known as the North Hibbing Property Owners Association, and thereafter all work and negotiations were conducted in the name of that association. Membership therein was open to anyone interested in the North Hibbing project. Plaintiff testified, however, that he and he alone constituted the association, and that he had sole charge of all matters relating to the proposed plan and appraisal.

At that time work on the appraisal commenced, involving a valuation of all properties in the North Hibbing district. The village of Hibbing, the township of Stuntz, and school district No. 27 all contributed substantially to the expense involved in compiling the appraisal. It was completed in the fall of 1929, a few months after the alleged conversation with P. J. Ryan. Both plaintiff and J. H. Ryan were active in supervising details of the work involved in making the appraisal. When completed, it was known as the "Dyer appraisal," after Mr. Dyer, one of the engineers in charge thereof.

On November 23, 1929, it was submitted to the Oliver company by a committee of the North Hibbing Property Owners Association, including plaintiff. The letter of submission, which is before us as an original exhibit, was signed "North Hibbing Property Owners Association," by A. C. Schirmer, president, and J. H. Ryan, vice-president. It was also signed by the mayor of Hibbing, the trustees of school district No. 27, the chairman of the township board, the chairman of the civic council, and A. E. Dyer, engineer of all appraisals. Accompanying the appraisal were signed contracts by over 90 percent of the property owners of North Hibbing wherein each agreed to sell his respective property at the price specified in the appraisal.

Plaintiff testified that he had advanced in excess of $1,300 on the appraisal for which he had not received reimbursement. He subsequently admitted on cross-examination that in February 1933 he had prepared and submitted a final report to the association wherein he had indicated a balance due him in the sum of $3.97 on such appraisal. This report indicated total expenditures amounting to $4,065.83, all of which had been paid either by contributions from property owners, governmental subdivisions, or funds from the Per Capita Committee of the Hibbing Chamber of Commerce, with the exception of said $3.97, then claimed by plaintiff. The appraisal was retained by the Oliver company and a photostatic copy thereof made.

In October 1930, plaintiff, together with a number of other members of the North Hibbing Property Owners Association, called upon Mr. Salsich, president of the Oliver company, at his office in Duluth to inquire as to what action would be taken on the proposed plan. Mr. Salsich advised the group that the matter was still under consideration by his company and that no definite action had as yet been taken thereon. Plaintiff testified that after the other members of the group had left the room he remained behind for a moment and had the following conversation with Mr. Salsich:

"I said to Mr. Salsich, * * * 'Of course you understand all about my agreement with Mr. P. J. Ryan?' and he said, 'Certainly I know all about it,' and I said, 'Well, what about this delay? Will this make any difference with the agreement?' and he said, 'No, certainly not,' that I would get my * * * pay when they used the appraisal, * * * we were talking about the appraisal, and he congratulated me upon the work that was done on the appraisal * * *"

This conversation was denied by Mr. Salsich and by other representatives of the mining company present at the time. It was not corroborated by any of the committee members present, although one of them testified that he recalled that plaintiff had remained behind for a moment after the group had left. It is submitted by

plaintiff as evidence of ratification by the Oliver company of the actions of P. J. Ryan. This defendant submitted in evidence a transcript of the reporter's notes of all proceedings made at the time of such meeting. There is no reference therein to any conversation such as that claimed by plaintiff, although all other details of the meeting are set forth completely.

In November 1930, the North Hibbing Property Owners Association, through plaintiff, formally requested the return of the appraisal and all documents and agreements deposited therewith, notwithstanding plaintiff's present claim that he had shortly prior thereto been advised that he would be paid as soon as the appraisal was used. Shortly thereafter all these documents were returned to the association by the Oliver company.

Thereafter plaintiff undertook a course of action in direct opposition to defendants. At the 1931 session of the legislature he sponsored a bill which would authorize the village of Hibbing to issue $5,000,000 in bonds to acquire the North Hibbing property for park and airport purposes. Had the legislation been enacted, the property would have been purchased by the village of Hibbing rather than the mining companies, and in consequence plaintiff's claim for commission could not have matured. The legislation was opposed by the mining companies. Plaintiff headed a delegation to St. Paul and spoke before the legislative committee urging the passage of the bill. At the trial plaintiff denied this, but, when presented with newspaper articles reporting his appearance before the legislature at the time, he admitted his support of the proposed legislation.

In 1933 plaintiff supported a new bill in the legislature which called for vacation of the plats of North Hibbing and payment of damage by the village to property owners, or for its use as an airport. He again went to St. Paul and appeared before the legislative committee in support of the measure. This bill likewise was opposed by the mining companies with whom he claims he then had a contract, and its passage likewise would have nullified any possibility of his claim maturing.

Defendant Oliver company presented in evidence a letter signed by plaintiff on the stationery of the North Hibbing Property Owners Association, dated April 1, 1933, and addressed to Congressman Pittenger, wherein plaintiff stated:

"It may interest you to know that I speak with direct knowledge in connection with the 20% tax reduction request controversy, as Chairman of the Steering Committee of the Mesaba and Vermilion Ranges, in direct contact with all matters pertaining to the same. Further, having for the past four years acted and assisted in trying to solve for the people and the Mining interests, *(without any personal compensation or otherwise)* the North Hibbing controversy through, if possible, the sale directly to the Oliver Mining Company." (Italics supplied.)

In 1930, the property owners of North Hibbing organized a new association designated as the North Hibbing Civic & Improvement Association. Ownership of real estate in' North Hibbing was a necessary qualification for membership. Plaintiff was not a property owner in North Hibbing but was made an honorary member of this association. This committee, in the absence of plaintiff, worked out a proposed plan under which legislation would be enacted to reduce the per capita limitation upon the levies of the village of Hibbing, Hibbing School District No. 27, and the township of Stuntz exclusively, and following which the mining companies were to devote the savings gained thereby to the purchase of the private property in North Hibbing.

Two resolutions were adopted by this association to put the plan into effect. In the first resolution, dated July 9, 1934, it was proposed that the mining companies, to consummate the purchase, pay immediate cash at the exact amount of the Dyer appraisal, and that all tax savings should go to the mining companies to reimburse them for such purchase. The mining companies declined to proceed on this basis. On August 28, 1934, a modified plan was incorporated in a resolution of the North Hibbing Civic & Improvement Association and submitted to the mining companies. Under the second resolution, the mining companies were to pay for the

North Hibbing property as they accumulated the tax savings over an eight-year period. The properties were to be purchased on a competitive bid basis at prices not to exceed the appraised value thereof set forth in the Dyer appraisal. This proposal was submitted to the various defendant mining companies, all of which accepted the terms thereof and agreed in writing to share in the purchase of the properties on the basis outlined. At the August 28 meeting plaintiff vigorously opposed this modified plan and, when his opposition was overruled, left the meeting and thereafter refused to be associated in any way with the plan. During all such meetings of the North Hibbing Civic & Improvement Association plaintiff asserted no claim of ownership to the Dyer appraisal.

Plaintiff continued his opposition to the proposed plan subsequent to the meeting. The village council of Hibbing submitted the proposal to a vote in December 1934 at the Hibbing village election, and the plan was approved at such election by 62 percent of the voters. Prior to the election, plaintiff, at his own expense, published advertisements in opposition to the proposed plan, notwithstanding that if his present contentions are correct, the consummation thereof would have matured his claim for $250,000 here asserted.

Thereafter bills were introduced in the 1935 session of the legislature designed to reduce the levy in accordance with the plan. Plaintiff vigorously opposed such legislation, and proposed alternative bills which would have again involved the acquisition of the property by the village rather than by the mining companies. Notwithstanding this, the bills introduced in furtherance of the August 28 plan were passed by both houses of the legislature at the 1935 session. Plaintiff then appeared with a delegation at the office of the governor to urge the latter to veto the same. The governor vetoed the bills, and they were subsequently repassed over his veto at the same session. L. 1935, cc. 132, 133, 134.

Plaintiff testified that shortly after the 1935 session, believing his payment was then due on account of the tax reduction, he contacted P. J. Ryan and asked for payment, because, as he stated,

the plan had been consummated by the passage of the legislation. He further testified that P. J. Ryan stated that he would have to wait until the mining companies had bought a considerable portion of the property under the plan, as payment to plaintiff at that time might upset the same.

At the 1937 session of the legislature plaintiff led a movement designed to repeal the 1935 laws, under which he now claims that he was entitled to compensation. At the trial he denied his appearance at the 1937 session and asserted that at that time he was at the Isle of Pines. When there were read to him newspaper accounts of his appearance at such session and of his attempts again to substitute the village purchase plan, he admitted such to be the fact.

Between November 23, 1929, and June 28, 1939, plaintiff at no time asserted his claim or made any demand upon the mining companies for payment, except for his alleged conversation with P. J. Ryan in 1935, denied by the latter. On June 28, 1939, he instructed his attorney to demand payment, but at that time made no assertion of an express five percent commission agreement. The demand asked only for reasonable compensation. Neither the original complaint nor the two amended complaints made reference to a five percent commission agreement. It was first mentioned at the trial.

In the meantime, starting in 1935, the mining companies had proceeded under the proposed plan and at the date of trial had purchased approximately $2,000,000 worth of North Hibbing property at prices substantially less than the figures specified in the Dyer appraisal. The companies manifested their intention of continuing under the proposed plan until all the properties had been purchased.

No showing was made that P. J. Ryan, agent of the Lake Superior Industrial Bureau, had authority to enter into an agreement in behalf of any of the defendants, and the undisputed testimony indicates that his agency was limited entirely to checking and auditing expenditures of the various governmental subdivisions on the Iron Range.

In explanation of his opposition to the tax savings legislation at the 1935 and 1937 sessions, plaintiff testified that he opposed the same because it meant that the property owners would have to sell their property to defendants on a competitive basis, and that he would be breaking faith with them if he permitted them to sell at anything less than the price set forth in the Dyer appraisal. Notwithstanding this explanation, a letter dated May 10, 1932, indicates that plaintiff, together with a number of others, forwarded a letter to defendants wherein they proposed a plan to sell the North Hibbing properties at the price specified in the Dyer appraisal, but to accept in payment thereof $100 par value common stock of the U. S. Steel Corporation, which then had a market value of $25 per share, or, in other words, at a discount of 75 percent of the figures specified in such appraisal.

Some additional testimony was presented which plaintiff asserts corroborates his claim of contract. The testimony of Mrs. Louise Peacha, former employe of plaintiff, was to the effect that she recalled that P. J. Ryan had once said in plaintiff's office that plaintiff would be well paid for his work on the appraisal. She did not say that Mr. Ryan had stated by whom the payments were to be made or in what manner. E. S. Dickinson, one of the engineers on the appraisal, testified that an employe of the Oliver company had stated to him that the mining companies were interested in the appraisal, but he did not testify to what extent nor in what connection insofar as plaintiff was concerned.

The record comprises some 1,500 printed pages of testimony. We do not attempt here to relate all of it, but we believe that the foregoing covers the relevant portions thereof submitted by both sides.

■ We are of the opinion that the action of the trial court in granting judgment notwithstanding the disagreement of the jury should be sustained in all particulars. There are a substantial number of reasons making it impossible for this court to arrive at any different conclusion or to take any different course. It will be unnecessary to discuss such reasons other than the one forming the basis of this decision.

The record as a whole thoroughly discredits plaintiff's claim and indicates that the evidence presented by him was so incredible and unworthy of belief, so conclusively overcome by other uncontradicted evidence and documents submitted, and so inconsistent with his actions throughout that nothing remained on which a verdict could stand. His testimony that the $250,000 commission was to be paid when the appraisal was used, and out of tax savings, is in conflict with almost every action taken by him after the completion of such appraisal. He demanded and procured the return thereof to the North Hibbing Property Owners Association shortly after its completion, notwithstanding his present claim that the use thereof by the mining companies matured his right to payment. He vigorously opposed the tax legislation, by virtue of which he now asserts that such claim ripened. He admitted in a letter to Congressman Pittenger that he had worked without compensation. He proposed legislation under which the village would have acquired the properties and the appraisal would have become useless to the mining companies for any purpose. He proposed by letter that the appraised values be reduced 75 percent by suggesting payments at par of U. S. Steel Corporation stock then selling at 25 percent of its par value, and later explained his opposition to the plan agreed upon because he asserted it would compel the property owners to accept less than the appraisal price. He made no claim for compensation until ten years after the work was completed and some four years after the tax savings had gone into effect, aside from a claimed conversation with P. J. Ryan in 1935.

The record is replete with other inconsistencies in plaintiff's claim and is filled with contradictions, afterthoughts, shiftings of position, and adverse admissions elicited under cross-examination. Time and again his oral statements were shown to be false in the light of written communications, reports, and other documentary evidence prepared by him long prior to the time any legal proceedings were foreseen by him.

We have called attention to a sufficient number to indicate the basis of our conclusion here. We cannot improve on the language

of the trial court in its memorandum attached to the order for judgment in summarizing the basis for its decision there, wherein it stated:

"Of course the chief difficulty with this case is the fantastic character of the claim made. Here the plaintiff is basing a claim for $250,000 on two short oral conversations which the claimed other parties to the conversations positively deny. Men of affairs do not do business that way. They do not agree to pay five percent on $5,000,000 without a scratch of the pen, nor do they ratify such an agreement in a casual aside conversation following a somewhat formal conference. Things are not done that way. Furthermore, practically every action of the plaintiff from October, 1930, on, makes his story incredible. If an agent has already done all that he claims he was supposed to do to earn a commission and the commission had not been paid because the properties, in fact, had not been taken over, he does not afterwards do everything possible to prevent his securing the commission, as was done here. Human nature never operated that way."

The law is well established that although evidence on the part of plaintiff standing alone might justify submission of a case to the jury, when such evidence is wholly incredible and conclusively overcome by other uncontradicted evidence, the court will not permit a verdict for plaintiff based thereon to stand. This rule is expressed in Brulla v. Cassady, 206 Minn. 398, 403, 289 N. W. 404, 407, wherein the court stated:

"We cannot accept plaintiff's suggestion that all of defendants' testimony should be discarded. Rather, we think, it is our duty to search the record and from it ascertain whether, 'upon all the evidence,' the verdict finds support. * * *

"* * * Though the evidence on the part of the plaintiff standing alone would justify submitting a case to the jury, yet the court should direct a verdict for the defendant if, upon all the evidence, it would be its manifest duty to set aside a verdict against him. In other words, the court should direct a verdict in favor of a party

in whose favor the evidence overwhelmingly preponderates, though there is some evidence in favor of the adverse party."

See also Giermann v. St. P. M. & M. Ry. Co. 42 Minn. 5, 43 N. W. 483; Karras v. G. N. Ry. Co. 167 Minn. 140, 208 N. W. 655; National P. & T. Co. v. Gilkey, 182 Minn. 21, 233 N. W. 810; Larsen v. N. P. Ry. Co. 185 Minn. 313, 241 N. W. 312; Mozes v. Borlaug, 190 Minn. 568, 252 N. W. 420; Kingsley v. Alden, 193 Minn. 503, 259 N. W. 7; Yates v. Gamble, 198 Minn. 7, 268 N. W. 670; Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, 77 L. ed. 819.

■ These factors and the decisions cited govern our conclusions here both as respects plaintiff's action on the express contract as well as the claims asserted under the alleged implied agreement. Plaintiff's actions are so thoroughly inconsistent with either form of agreement that it would be the duty of the court to set aside any verdict in his favor on either cause of action. It appears further, however, if his testimony be taken at its face value, that his claim based on the implied contract is barred by the statute of limitations. Whatever work was performed by plaintiff was completed in November 1929. Thereafter, as previously indicated, all his actions were in opposition to defendants. On his own testimony, when the agreements were turned over to the Oliver company, he had completed his work. As he expressed it: "to make the appraisal and get the agreements, that was my work." Since under an implied agreement of this type no formal promise to pay is claimed or established, the six-year limitation period would terminate with the expiration of the year 1935.

If it could be urged that that portion of the express agreement relative to payment out of tax savings extended the maturity of plaintiff's claim under the implied agreement, then we reassert, for the reasons previously expressed herein, that no verdict based on such a claim could stand. His opposition to all legislation which would result in tax savings and mature his claimed right to compensation completely discredits his testimony that an agreement was made on such a basis.

■ It has been suggested that under the law of unjust enrichment plaintiff's claim matured in 1935 at the time the mining companies first used his property, to wit, the Dyer appraisal. As previously indicated, there is nothing whatever in the record to substantiate his claim that this appraisal was his property. Of the total cost thereof in excess of $4,000, plaintiff could only show that he had contributed the sum of $3.97 plus some additional cancelled checks totalling $3.50. The financial report prepared by him and submitted to the North Hibbing Property Owners Association establishes these factors conclusively. If, therefore, the theory of unjust enrichment is urged, the conclusion cannot be escaped that such a claim must fail, not only because of the incredibility of plaintiff's testimony and claims in connection herewith, but for the additional reason that the evidence would not sustain a finding by a jury that plaintiff was the owner of the Dyer appraisal.

■ Plaintiff asserts that the court erred in sustaining defendants' objections to certain questions asked E. S. Dickinson, Jack F. Blake, and Archie McPhail. Dickinson was asked to relate conversations between him and certain employes in the engineering department of the Oliver company to the effect that "the mining companies * * * were interested in having the appraisal made and that they were working with Schirmer in connection" therewith, and that his (Dickinson's) "pay would be there." No evidence was presented to show that such statements were authorized by defendants or that the employes indicated possessed either actual or apparent authority to make them. At the most, they were general statements not going to the facts in dispute nor corroborating in any respect plaintiff's claim of an express or implied agreement. The record is filled with evidence that the mining companies were interested in the appraisal and in ending the controversy with the property owners of North Hibbing. Such facts do not lend support to the terms of the agreement claimed by plaintiff. Likewise, with respect to errors claimed in sustaining objections to the testimony of Jack F. Blake and Archie McPhail, to the effect that there was general talk among the property owners that plain-

tiff was probably in the employ of the mining companies. Such talk would prove nothing insofar as this cause of action is concerned, and the court properly sustained objections thereto. At best it was cumulative. If admitted, it would not have strengthened plaintiff's case either as to the express or implied agreement and would not have made possible any different result in the litigation.

The judgment of the trial court is affirmed.

MR. JUSTICE MAGNEY, having presided at the trial of this case in the district court, took no part in the consideration or decision of this case.

MR. JUSTICE STREISSGUTH took no part in the consideration or decision of this case.

