## J. F. WOLFF v. RHUDE & FRYBERGER, INC.

145 N. W. (2d) 299.

September 2, 1966—No. 39,836.

*Robins, Davis & Lyons, Solly Robins, Stanley E. Karon, Fryberger, Fryberger & Smith,* and *A. N. Smith,* for appellant.

*McCabe, Van Evera, Mundt, Koskinen & Clure* and *Theodore L. Hall,* for respondent.

OTIS, JUSTICE.

This is an action to recover the value of services rendered by plaintiff, a mining engineer and geologist, in preparing for defendant's predecessor a report concerning the nature and value of certain taconite property which plaintiff asserts was the inducement for a profitable lease with Pickands Mather, a mining company. The case was tried without a jury and resulted in a judgment of $165,800. Defendant has appealed. Because we find the award to be grossly excessive and reached by the application of an inappropriate formula, the matter is remanded for a new trial on the issues herein specified.

Prior to April 10, 1957, defendant conducted its operations as a partnership consisting of Jens O. Rhude and Robert M. Fryberger, who were engaged in acquiring, leasing, subleasing, and operating various iron mining properties on the Mesabi Range. Following the death of Robert Fryberger, the defendant on January 1, 1960, was incorporated.

The property here involved consists of 240 acres in St. Louis County described as the S ½ of the NE ¼ and the NW ¼ of Section 24, Township 58, Range 17 West (hereafter referred to as Section 24). The partnership became interested in the property at a time when the taconite industry was in its infancy, and on January 1, 1951, secured a lease from the fee owners. Upon the dissolution of the partnership the

leasehold in Section 24 was assigned to the surviving partner and the heirs of the deceased partner. The corporate defendant has never had an interest in the real estate.

After some 44 years of employment with the Oliver Iron Mining Company, plaintiff retired in December 1952. Early in 1953 the partnership retained him to negotiate with Oliver for the lease of properties which the partnership believed they could profitably mine. Oliver was not interested. Consequently, at Wolff's suggestion, Rhude and Fryberger explored the possibility of inducing Oliver to exchange other property it owned for the lease of Section 24. By then the partners had already requested plaintiff to prepare a report on Section 24, hoping thereby to induce a lease, and on March 9, 1953, they agreed to present it to Oliver. The report, which is in evidence as exhibit A,[1] was completed on April 4. It was then submitted to Oliver but within a week the proposal was declined.

Efforts were thereafter made to interest Pickands Mather in the lease. To that end in July 1956, the Wolff report was referred to Otto Yauch, their local manager of engineering and mine development. In June 1958 they secured additional tracings from Wolff and proceeded to expend approximately $300,000 over a period of 4 years surveying the property's taconite potential. On January 1, 1960, Pickands Mather and defendant finally entered a contract, effective in January 1962, the terms of which are as follows: The fee owners were to receive 30 cents per ton of concentrate with a minimum royalty of $10,000 a year, and Rhude and Fryberger were to receive 20½ cents per ton with a minimum to them of $20,000 per year.

This action was sued by plaintiff on the theory he was entitled by contract to 25 percent of the royalties realized by defendant from its sublease.[2] In the alternative the plaintiff has prayed for the sum of $500,000 on a quantum meruit theory, and argues in his brief that the

---

[1] A facsimile of the main portion of the report, without the supporting data, is attached as an appendix.

[2] Over defendant's objection the pleadings were amended to claim a percentage of "profits" rather than "royalties," which were barred by the statute of frauds.

evidence supports an award approaching $2,000,000. Defendant denies any contract to compensate plaintiff on a commission basis; asserts as a defense the statute of frauds and the statute of limitations; and contends that the corporation is not liable for the obligations of the partnership, that the report did not induce the Pickands Mather contract, and that the court erred in refusing to require plaintiff to produce a statement of facts prepared by him in anticipation of trial. We have considered all of the issues thus raised and are of the opinion that the only assignment which has merit and requires extended discussion is that dealing with the basis for plaintiff's compensation.

As to defendant's liability for partnership obligations, suffice it to say that although those who benefited from plaintiff's services are not parties, defendant's vice president, William Fryberger, acknowledged at the trial that the corporation had assumed all the liabilities and responsibilities of the partnership.

■ With respect to the statute of limitations, it appears that as late as 1958 part of the material prepared by Wolff was furnished Pickands Mather by defendant. In addition, the trial court found the parties agreed that plaintiff would be compensated when the services he performed ultimately proved fruitful in inducing a sale or sublease of Section 24. Defendant's negotiations were not successfully concluded until 1960 when the Pickands Mather transaction was consummated. Under these conditions we hold the evidence sustains the court's decision that the statute of limitations had not run when the action was begun.[3]

■ Turning to the principal issue in the case, the trial court held that "there was no [admissible] proof that Mr. Wolff was to be paid any specific amount for his work." The award was made on a quantum meruit theory.

Specifically the court held as follows:

"* * * [T]he agreement was that Wolff would be compensated if a sale or assignment of the lease was made to any purchaser, and,

---

[3] Bachertz v. Hayes-Lucas Lbr. Co. 201 Minn. 171, 275 N. W. 694; 11 Dunnell, Dig. (3 ed.) § 5602. See, also, In re Hess' Estate, 57 Minn. 282, 59 N. W. 193.

further, the agreement was that Rhude & Fryberger would pay plaintiff for his services, taking into consideration: (a) that the payment of compensation would be contingent, and (b) the value of the transaction to the partnership."

In its accompanying memorandum the court made the following observation:

"Probably Mr. Yauch's opinion as to the value of the services, namely, one cent per ton of ore removed, contemplated pay as the ore would be removed, thus extending over a possible long period of time in the future, and the same would be true if the compensation was to be a certain percentage of the profits realized. However, the Court feels that with all the evidence before it, it is justified in finding that the present worth of the services, to be paid in a lump sum before operations under the lease are completed, is the amount stated in the findings."

Upon a motion for amended findings, the court reduced the initial award of $192,000 to $165,800. In so doing it noted that "plaintiff's compensation was to be contingent on the kind of deal made and that the better deal that was made the greater the compensation would be." The court then proceeded to comment on the number of tons of concentrates which could be mined from Section 24, and the amount of the royalty per ton payable to defendant, and found the lease had a potential value to defendant in excess of $3,000,000. However, no reason was stated for reducing plaintiff's award to $165,800. Viewed in a light most favorable to plaintiff, we consider the record inadequate to support the finding, implicit in the court's decision, that plaintiff's compensation is to be measured by reference to a royalty per ton for recoverable ore.

Plaintiff testified that immediately after Oliver rejected defendant's proposal in April 1953, William Fryberger said to plaintiff, "If Pickands Mather and Company will take this lease, we can start paying you for your work on this Section 24 project," to which plaintiff replied, "William, I don't want anything from this for my work on this project until Rhude and Fryberger starts to get something out of it, and then

you can pay me the 25 percent commission." In November 1959, according to plaintiff, the defendant suggested it begin paying plaintiff on a monthly basis. Wolff testified he rejected that proposal with the comment that he had a continuing contract which called for a commission. Fryberger concedes that in 1960 without acknowledging liability he offered to pay plaintiff $2,000 because of his long friendship for Mr. Wolff. A final discussion of compensation occurred between plaintiff and Jens Rhude in September 1962. Rhude then categorically denied defendant had incurred any obligation except with respect to the Oliver proposals which were not consummated. As to them, he conceded that if it had been a good deal Wolff would have been paid more than if a poor deal was made, but in either case Wolff was to be paid "on the engineering basis," as distinguished from a contingent fee based on profits.

In Spensley v. Oliver Iron Min. Co. 216 Minn. 451, 462, 13 N. W. (2d) 425, 430, we quoted an observation made by the trial court which we believe is applicable to the case at hand:

"* * * Here the plaintiff is basing a claim for $250,000 on two short oral conversations which the claimed other parties to the conversations positively deny. Men of affairs do not do business that way. They do not agree to pay five percent on $5,000,000 without a scratch of the pen * * *."

All the parties in the instant case were familiar with the financial operations of the world of commerce. It is inconceivable that they contracted for an obligation which plaintiff now contends would justify an award of nearly $2,000,000, without in some manner tangibly confirming their agreement. Ten years elapsed between the time the services were performed and suit was started. During all of that period only the most casual references to compensation were made by either party. Plaintiff concedes that in the absence of any special agreement for a commission or a percent of profits the standard charge for professional services of the kind he rendered was $100 a day, and that he expended 22 days in preparing the report. He admits that he had performed similar services on that basis, the most extensive being over a period of 80 days

for which he charged $8,000. The only other testimony of what is a reasonable charge was elicited from Otto Yauch, on whom the trial court appears to have relied heavily. Mr. Yauch, by deposition, testified that Section 24, according to Pickands Mather's estimates, contained 22,000,000 tons of taconite concentrates. He stated that a fair royalty to Mr. Wolff, assuming he was to be paid on a contingent basis, would be 1 cent a ton, which translates into $220,000. Apparently the court adopted a modified version of this formula in making its award. However, on cross-examination, Mr. Yauch qualified his answers in several important respects. First, the royalty he mentioned was based on the assumption it was a finder's fee; second, it was payable only after the ore was out of the ground and shipped; and third, all such arrangements of which he had knowledge had been in writing. Because in the instant case none of these conditions existed, we are of the opinion the court's reliance on Mr. Yauch's testimony was unjustified and resulted in an award which we find to be grossly excessive.

Although the officers of Pickands Mather denied that the report played any part in inducing their sublease, and stressed the fact that they themselves spent 4 years and $300,000 investigating Section 24, there is evidence on which a factfinder could properly determine that the Wolff report was the principal inducement which precipitated the inquiry leading to the January 1, 1960, lease. Consequently, that issue need not be relitigated. Nor is there any question but that Mr. Wolff was, and is, a person of unusual training, talent, and prestige, whose work product excited more than passing interest and attention in the industry. Apparently there were only two or three engineers of his stature on the Mesabi Range. The real benefit from the report was Wolff's interpretation and projection of the productivity of Section 24, determined by computations requiring skill and experience. However, none of the information he secured as a basis for making his report was original with him. It was obtained from Rhude and Fryberger's own studies and drilling, from the Eveleth fee office, and from the University of Minnesota Mines Experimental Station.

While we do not entirely discount as a factor bearing on compensation the value to defendant's predecessor of the transaction which the

report helped induce, the benefits realized were not entitled to the weight the court gave them in arriving at what was found to be a reasonable charge. A compelling reason why the court's decision is untenable is the fact that it constitutes a lump sum award based on *potential* profits as distinguished from *realized* profits. The sublease in question is terminable by Pickands Mather at will and hence may never produce a profit. At the time of trial, no taconite had actually been mined from Section 24. There was therefore no fund created, except the annual minimum royalty, out of which a fee based on a percentage of potential profits could be paid.

Upon a retrial we are of the opinion that the usual criteria for determining the reasonable value of professional services should apply, excluding from consideration plaintiff's theory he was entitled to a commission, royalty on tonnage, or percentage of profits, but including among other things the following: Fees customarily charged for similar services; the time and skill which were required and devoted to the preparation of the report; the prestige of its author; the fact that it was the "principal inducement" prompting Pickands Mather to enter the sublease; and to a limited extent only, the benefits which thereby accrued to defendant's predecessor.

Reversed and remanded for a new trial on the issues specified.

### APPENDIX
### SUMMARY OF PROPOSED TRADE OF LEASES OF
### O.I.M. DIV'N'S. 100 ACRES IN SEC. 9-58-16 & SEC. 24-58-17,
### FOR RHUDE & FRYBERGER TACONITE LEASE (240 A.)
### IN SEC. 24-58-17

| | | Tons | Nat. Iron | Tons Metallic Iron |
|---|---|---|---|---|
| O.I.M. Div'n — Nat'l Ores | | 4,800,000 | 47.11 | 2,264,000 |
| | (Readily Minable Ctrs. | 24,640,000 | 64.00 | 15,800,000 |
| R. & F. Lease | (Possible Add'l " | 14,310,000 | 65.50 | 9,400,000 |
| | ( | | | |
| | ( TOTAL | 38,950,000 | 64.70 | 25,200,000 |

| | | Tons | Nat. Iron | Tons<br>Metallic Iron |
|---|---|---|---|---|
| N½-NE¼<br>24-58-17 | )Additional Ctrs.<br>)Obtainable | 22,850,000 | 65.00 | 14,860,000 |
| TOTAL CONCENTRATES<br>OBTAINABLE | | 61,800,000 | 64.80 | 40,060,000 |

Taconite Royalty on R. & F. Lease—4.31% of Standard N.B. Mine Value (Ann. Min.—$10,000 starting 1-1-54)=$ .28575 / T. for 1953 Natural Ore Av. Royalty Offered By R. & F.—$1.708 per G. T.

R. & F. to sell Natural Ores back to Oliver at price dependent upon Royalty Rate paid.

No Federal Income Tax on Oliver's royalty receipts because leases have been traded, Oliver reinvesting Royalty receipts in Taconite.

Total Oliver Royalty Receipts from Nat'l Ores to be — $ 8,200,000
Total Oliver Royalty Payments to be:

On Readily Minable Concentrates — 7,040,880
Possible Total Concentrates $11,129,963

ROYALTY ACCOUNT (with accumulated Interest) will pay all Taconite Royalties, and leave large balance, — assuming Natural Ores to be mined in next 10 Years, and Taconite 37 Years hence.

R. & F. PROFITS ON NATURAL ORES = 9¢ to 14¢ per ton of
Taconite Concentrates contained in their lease to OLIVER.

TRADE ENABLES OLIVER TO ACQUIRE
33 to 62 MILLION TONS TACONITE CONCENTRATES containing 21 to 40 MILLION TONS METALLIC IRON

AN OFFER OF THE
RHUDE & FRYBERGER LEASE IN N½ OF SEC. 24,
T. 58 N., R. 17 W.
ST. LOUIS CO., MINN.

*PROPERTY*
Rhude & Fryberger hold a 50 year lease dated Jan. 1, 1951 on NW¼

& S½ of NE¼ — Sec. 24, T. 58 N., R. 17 W., St. Louis Co., Minnesota. (For location see accompanying map).

*LEASE TERMS*

The lease has royalty rates for different ore classifications including taconite. Since explorations have disclosed only taconite, the royalty rate on the latter is important; it is 4.31% of the Mine Value of Standard Mesabi Non-Bessemer Ore (51.5% Nat. Iron) which on the 1953 revised price of $6.63 at mine gives a Royalty of $.28575 / Ton of Concentrates.

The Annual Minimum Royalty will be $10,000.00 starting January 1, 1954.

*EXPLORATIONS & MAGNETIC TACONITE*

Earlier explorations and more recent ones by Fee Owners and Present Lessees have disclosed Fresh Very Magnetic Taconite in both Upper and Lower Cherty horizons on the property.

Magnetic concentration tests made at the Univ. of Minnesota on cores from Lower Cherty horizon from three holes drilled by the Fee Owners gave Concentrates averaging more than 65% Iron with Weight Recovery of 38% on material ground to pass 100 Mesh.

Cores from recent holes drilled for present lessees were crushed to pass 16 Mesh screen and dry concentrating tests were made on an electro-static machine. Concentrates containing 54% Iron, 15 to 16% Silica with *27.5%* Weight Recovery were made from the better part of the Lower Cherty horizon. Such material could be sold without sintering or other agglomeration and shipped mixed with Natural Ores. Such operation however would not utilize all the magnetic taconite to the maximum advantage.

Recent explorations in the Upper Cherty horizon show Rich Very Magnetic Granular Taconite, cores of which the writer has examined, similar to taconite from the same horizon in the Mt. Iron District which yielded high grade concentrates after fine grinding.

Cores from holes drilled for the owners, examined by the writer disclosed 20 feet of magnetic fine-banded taconite just below the Up-

per Cherty horizon. Similar material in the Mt. Iron District yielded good concentrates.

*ESTIMATE OF OPEN-PIT MINABLE TACONITE & RECOVERABLE CONCENTRATES*

From exploration and concentration records and personal knowledge of similar data, the writer has estimated the following Readily Minable Taconite and Concentrates from Upper and Lower Cherty horizons and Top 20 feet of Lower Slaty horizon, and Possible Additional tonnage obtainable in the more distant future if the lower slaty taconite is removed from the Lower Cherty horizon. The following quantities are estimated from cross-sections and map accompanying this presentation:

## GROSS TONS

| | Taconite | Concentrates | Iron | Metallic Iron |
|---|---|---|---|---|
| Readily Minable | 69,500,000 | 24,640,000 | 64.00 | 15,800,000 |
| Possible Additional | 38,000,000 | 14,310,000 | 65.50 | 9,400,000 |
| TOTAL | 107,500,000 | 38,950,000 | 64.70 | 25,200,000 |

The following additional Tonnage is obtainable from the LaBelle, N½-NE¼, Sec. 24-58-17, north of R. & F. Lease, now held by W. S. Moore under a 25 year lease for "natural ores":—

| | | | | |
|---|---|---|---|---|
| | 63,300,000 | 22,850,000 | 65.00 | 14,860,000 |

TOTALS OBTAINABLE FROM NORTH ½ of SEC. 24-58-17

| | | | | |
|---|---|---|---|---|
| | 170,800,000 | 61,800,000 | 64.80 | 40,060,000 |

A taconite lease should be obtainable on the LaBelle by a Strong Holder of the Rhude & Fryberger lease after Moore surrenders his present 25 year lease. He is obligated to explore around border of old U. G. caves seeking washable or heavy-media ore.

*PROPOSED TRADE OF LEASES*

Rhude & Fryberger suggest the trade of their lease for a lease on one or more small isolated Oliver Co. lower grade natural ore properties containing perhaps approximately only one-tenth the metallic iron obtainable from concentrates from their Sec. 24 lease, they paying royal-

ties of $1.50 to $2.00 per ton, and delivering the ore back to Oliver Co. at a negotiated price, depending on the royalty rate agreed upon.

Thus Oliver would keep its Present Metallic Iron, after having it mined for it, and would get in addition 16,000,000 to 25,000,000 tons of New Metallic Iron.

The Natural Orebodies suggested for lease to R. & F. are those designated 0-45 and 0-51 in the State Mining Directory. They probably contain the following tonnages of Open-Pit Shipping Ores (including Paint-Rock):

| | | Gr. T. Ore | Nat. Iron | G. T. Metallic Iron |
|---|---|---|---|---|
| 0-45 — SW-NE & SE-NW, — 9-58-16 | | 2,800,000 | 46.00 | 1,288,000 |
| 0-51 — SW-SW | 24-58-17 | 2,000,000 | 48.80 | 976,000 |
| TOTAL | | 4,800,000 | 47.11 | 2,264,000 |

The above 2,264,000 tons Metallic Iron in the Natural Ores is only one-seventh (1/7) the 15,800,000 tons metallic iron obtainable from the R. & F. Readily Minable Taconite Concentrates, or only one-eleventh (1/11th) of the 25,200,000 tons Total Possible Metallic Iron recoverable from their lease.

*ROYALTY ACCOUNTS*

R. & F. offer to pay $1.50 per ton royalty on the poorer Sec. 9-58-16 property and $2.00 per ton on Sec. 24 property. The total accruable to Oliver would be $8,200,000 probably within a 10 year or less operating life after 1/1/1954, during which time Oliver would pay only $100,000.00 minimums on the taconite lease.

Since the leases would be trades, Oliver would only be receiving advances with which to pay its future taconite royalties and should pay no income tax on its royalty receipts, which however should be worth a minimum of 3% interest to the Company.

Assume that Oliver would not start mining this R. & F. taconite until the last 10 years of the lease, 37 years after 1/1/1954.

A detailed Royalty Account statement accompanying this memorandum shows that the royalties offered by R. & F. on the two natural-ore

bodies, if accrued at a safe (bond not a speculative) rate of interest of 3% will pay all the taconite royalties on the Readily Minable 24,600,000 tons at the 1953 royalty rate, and at the end of the lease will have a balance of nearly $19,000,000 with which to pay the royalty on the 14,309,000 tons of Possible Additional Concentrates obtainable from this lease, and for any increase in taconite royalty rate due to increased ore price over 1953 rate.

### SUMMARY & CONCLUSION

This proposed trade will permit the Oliver Co. to have 4,800,000 tons of ore mined for it within the next say 10 years from which it will receive $8,200,000.00 in royalties which will finance the royalty payments on 25,000,000 to 40,000,000 tons of taconite concentrates which will contain 16,000,000 to 25,000,000 tons of metallic iron, obtainable by Oliver from the R. & F. Lease. Oliver will receive its natural ores from R. & F. and will add to its reserves the above tonnages of concentrates and metallic iron.

A correlative advantage to Oliver will be the uninterrupted passage in its future taconite open-pit operations from its Gilbert area properties to its Corsica-McKinley area properties. Acquisition of the R. & F. Lease will make available to it the taconite concentrates in the LaBelle 80 acres, (8,000,000 to 23,000,000 tons), the greater part of which would not be accessible without the R. & F. Lease, and also in its own properties to the east, W½ of NW¼ — Sec. 19-58-16.

The only income which the Oliver may forego immediately by this trade may be the possible profit over and above the royalty which it will receive from R. & F. which probably will represent 70% of the total possible profit. The balance profit which R. & F. may obtain will amount to only 14.3¢ per ton of Readily Available Taconite Concentrates or 9¢ per ton of Possible Concentrates from R. & F. lease, (see attached statement).

In effect Oliver would be buying a sub-lease on 64 to 65% Fe Concentrates for 9¢ to 14¢ per ton by this trade, a very low price, and besides would have nearly $19,000,000 balance in the Royalty Account.

In Summary, this offer makes possible the ultimate acquisition by Oliver of 33 to 62 million tons of taconite concentrates containing 21 to 40 million tons of metallic iron.

### DRILL CORES AND SAMPLES AVAILABLE FOR CONCEN-TRATING TESTS

A considerable quantity of taconite cores and some crushed cores from holes drilled by fee-owners and R. & F. are available for concentration check tests.

The Oliver Co. would be free to do any additional check drilling it might desire to confirm geologic cross-sections, tonnage estimates and quality and recovery of concentrates reported herein.

Good outcrops of both Upper and Lower Cherty taconite are available for inspection and sampling on the property; see locations on accompanying map and cross-sections.

### MAP, CROSS-SECTIONS & DETAILS OF ESTIMATES

A Map of North ½ of Sec. 24-58-17 and such geologic cross-sections as drill reports permit are attached showing the areas of estimated open-pit minable taconite. Details of estimate computations and other statements above referred to, and summaries of estimated tonnages are given in the following, which the writer will gladly review if desired.

Conservative Recoveries and Grade of concentrates from Upper Cherty and Top of Lower Slaty were used, and Additional Possible Upper Cherty tonnage was omitted from the estimate.

Respectfully Submitted

(Signed) J. F. Wolff Sr.
Mining Engineer and Geologist

April 4, 1953

UPON APPEAL FROM CLERK'S TAXATION OF COSTS.

On October 7, 1966, the following opinion was filed:

PER CURIAM.

Respondent Wolff has appealed from the clerk's taxation of costs and disbursements, asserting that he prevailed on the issue of liability which was vigorously contested by appellant in this court.

We agree that it would be inequitable for respondent to bear all of appellant's considerable costs in addition to assuming his own.

Therefore, under the discretion conferred by Minn. St. 607.01, subd. 2, we hold that the costs and disbursements to be taxed against respondent shall be limited to the sum of $500.